[No. 33469. Department Two. May 24, 1956.]

HAROLD PARKER, *Respondent*, v. SKAGIT COUNTY, *Appellant*.[1]

[1]Reported in 297 P. (2d) 620.

*W. J. Deierlein, Jr. (R. V. Welts,* of counsel), for appellant.

*Boynton Kamb* and *Alfred McBee,* for respondent.

ROSELLINI, J.—This action was brought to recover damages for personal injuries and property damage alleged to have resulted from the negligence of the defendant in failing to maintain one of its roads in a reasonably safe condition. The defendant denied that it was negligent and affirmatively alleged that the plaintiff's injuries were due to his own negligence in failing to keep a proper lookout for traffic conditions, failing to keep his vehicle under control, driving at an improper speed, and operating his motor vehicle while under the influence of, or affected by, intoxicating liquor. The jury returned a verdict for the plaintiff in the amount of $18,500. The defendant moved for a judgment notwithstanding the verdict and, in the alternative, for a new trial. Both of these motions having been denied, judgment was entered on the verdict, and the defendant has appealed.

The accident in question occurred on July 28, 1950, at approximately six-thirty p. m. It was daylight, but it had been raining and there was a slight mist. The plaintiff, with his two passengers, Ben Webber and Dora Falkner, both of whom were seated in the front seat with him, was driving his 1942 Packard club sedan from Sedro Woolley to Mount Vernon, traveling on a country road known as the "Dollar road," over which the plaintiff had traveled previously the same day. The road was of blacktop, or asphalt, construction. At the east approach to a bridge, which crossed a small slough, there was a hole or depression in the roadway, described by witnesses as being three or four inches deep at its deepest part extending the width of the highway, and tapering off over a distance of from ten to twelve feet. As the plaintiff drove over this depression and reached the bridge, he lost control of his car, which swerved onto the opposite side of the road and collided with a Studebaker sedan approaching from the opposite direction. The force of the impact turned the Studebaker around and

caused it to strike a Plymouth coupe behind it, the driver of which had pulled over to the side of the road to avoid a collision. As a result of the accident, the driver of the Studebaker and his wife were killed instantly, and all of the persons riding in the plaintiff's vehicle were injured. The plaintiff was permanently disabled, and his automobile was totally demolished.

Two persons, Don Reynolds and Maynard Thompson, driver and passenger in another vehicle which was approaching behind the Plymouth, were eyewitnesses and testified at the trial.

In support of its contention that it was entitled to a judgment notwithstanding the verdict, the defendant county maintains that the evidence was insufficient to establish its negligence. A motion for judgment notwithstanding the verdict admits the truth of the evidence of the party against whom the motion is made and all inferences reasonably to be drawn therefrom, and requires that the evidence be interpreted most strongly against the moving party and in the light most favorable to the opposing party. The motion is to be considered solely in the light of the plaintiff's evidence. *Bulette v. Bremerton,* 34 Wn. (2d) 834, 210 P. (2d) 408.

Neither of the passengers in the plaintiff's automobile testified as to the nature of the depression or "bump" which the car hit when it went out of control. The witness Webber stated, "We hit that bump and it threw the car, the front end of the car over on the wrong side of the road." The witness Falkner testified, "Well, the best I can remember is hitting the bump and him losing control of the car and trying to get back on the right side, and I fainted."

The plaintiff testified that he was traveling at a speed of about forty-five miles per hour when the accident occurred. His description of the event on direct examination is as follows:

"Well, I hit a few of those little roughened places that was roughened, and rumbled the car a little bit, and these other cars I seen, there was two or three maybe coming, and I put my lights on dim and the cars were getting pretty

close and about that time something, it looked like, got under the front end of it and pushed it up in the air and throwed me sideways, and I guess I was into a spin or something, and started sliding sideways, and I knew if I put my foot on the brake to slow it down on that wet highway it would make it worse, so that I, I was going to give it more gas and pretty soon (indicating with fingers); that is all I remember."

On cross-examination, when asked whether he had not previously described the bump in his deposition, he said:

"I never described that particular bump, no; there were wrinkling spots where the road was loosed up a little bit that I always swerved to miss in the daytime, but I never did see, I never knew nothing like that was there."

Evidence of all the other witnesses conclusively established that the accident occurred in broad daylight and that the headlights were not turned on. None of the other witnesses mentioned "wrinkled" or "loosed up" places in the highway, or any defect in the highway other than the depression (described by plaintiff's passengers as a bump) at the approach to the bridge. The plaintiff testified that his memory had been adversely affected by the brain injury which he received in the accident, and his testimony, conflicting as it does with that of his other witnesses and with the physical facts, is of little value.

Myrtle Rust, a witness for the plaintiff, who testified she had once momentarily lost control of her car at this point on the highway, described it as follows:

"It was a common long hole and it was, I would say, an average of two inches all the way across, but where the tires hit it was lower on this side, over three inches, and probably a little less on that side."

James Shafer, another witness for the plaintiff, who lived beside the county road, testified that shortly before the accident a driver lost control of his truck and trailer, and a jeep went into the ditch to avoid hitting the trailer. He described the hole as

". . . a jetty in there about approximately four inches from the bridge over to the hardtop, to the hardtop

there; in other words, a four inch hole there at the, at the bridge . . . four inches deep clear across the road."

He testified that he always slowed down and that his car was never thrown out of control by the depression; that he mentioned the condition to a representative of the county; that the county was always co-operative about working on the highway; that this particular place was repaired two or three times in the short time he had been there; and that it may have been repaired after his complaint and before the accident.

Ben Taylor, driver of the jeep involved in the incident which James Shafer described, also lived beside the highway. He described the defect in the road as

" . . . a depression there where the road is down from the bridge; I would say probably three inches on the right side there where traffic going west would hit it."

He further testified, "you would have to slow down; I would going across there." He stated that he had seen milk cans and cement sacks fly off trucks at this particular point, and that his house would shake when cement or lumber trucks went across the depression. He had never seen a car go out of control.

John Jensen, driver of the truck involved in the incident described by James Shafer, testified that he drove across the bridge several times a day in the course of his employment. He testified that, on the day of the incident involving his truck, it had been raining and there was oil slick on the road. He was in a hurry and had to slow down too quickly and lost control when he hit the bump. He was aware that it was there and knew that it had been repaired several times. His trailer was empty at the time of the incident, and he admitted on cross-examination that such vehicles are tricky to handle.

This is the substance of the plaintiff's evidence concerning the defect in the highway.

Witnesses for the defendant testified that the depression was a gradual one, not a drop off, that it was caused by the fact that the soil was sandy and the weight of traffic tended

to depress the highway; that the condition frequently occurred at approaches to bridges; that the depression was regularly repaired in the course of ordinary maintenance but tended to recur with constant travel. There was evidence that from 2,000 to 3,000 cars passed over the road each day. Highway patrolmen, who examined the scene of the accident on the night it happened, found nothing in the condition of the road which would warrant the setting up of barriers or warning signals to prevent another accident. The witnesses Reynolds and Thompson testified that they drove back over the highway two or three nights later and because of the accident paid special attention to the condition of the road at the bridge and observed nothing unusual in passing over it. They did not slow down. The depression was patched by the county maintenance men about a week after the accident, in the regular course of their maintenance work. Approximately one third of a yard of asphalt mix was used to fill the 10- to 15-foot long, 10-foot wide area.

"The rule is well-nigh universal in this country that, although a municipality is not an insurer against accident nor a guarantor of the safety of travelers, it is nevertheless obligated to exercise ordinary care to keep its public ways in a reasonably safe condition for persons using such ways in a proper manner and exercising due care for their own safety." *Berglund v. Spokane County,* 4 Wn. (2d) 309, 103 P. (2d) 355, and cited authorities.

To support its contention that the evidence failed to show wherein it had failed in its duty, the defendant relies upon the case of *Throckmorton v. Port Angeles,* 193 Wash. 130, 74 P. (2d) 890. In that case, there was an abrupt drop from the pavement to a graveled intersection in which chuckholes as deep as five inches had been worn, and which the city frequently filled with dry gravel. The gravel was soon displaced by traffic. A fire truck going through the intersection struck these holes and was thrown out of control, striking and killing a thirteen-year-old boy. We held that the city was not liable, inasmuch as the plaintiff had failed to show what the city could have done other than what it

did, in the exercise of reasonable care, to prevent the holes from developing in the graveled surface.

The *Throckmorton* case was distinguished in two later cases, *Leiva v. King County*, 38 Wn. (2d) 850, 233 P. (2d) 532, and *Bulette v. Bremerton, supra*. In the latter case, an asphalt highway was involved. There were holes or depressions at the place of the accident as much as six inches wide and from one to two inches in depth, creating a washboard effect. The evidence showed that these holes could readily be patched, and when this was done, the patching would seldom be displaced. The patches were always stronger than the surrounding street. Since the city could easily have remedied the situation, the case was distinguishable from the *Throckmorton* case, and a judgment for the defendant notwithstanding the verdict in favor of the plaintiff was reversed.

In *Leiva v. King County, supra,* the court distinguished the *Throckmorton* case on the same ground. The accident in the *Leiva* case was caused by a series of chuckholes in the asphalt pavement, extending along the highway for a distance of seventy to one hundred feet. These chuckholes were filled with water at the time of the accident and were invisible to the plaintiff, and immediately preceding them was a smooth stretch of pavement. Although the county had repaired the holes from time to time, no heavy roller equipment was used to compress the patching, a technique which would have rendered it effective. The court held that the condition of the road constituted a trap, and that the county had failed to exercise reasonable care in the maintenance of the road in question.

 The plaintiff's evidence in the case at bar established that there was a depression in the road, but the nature of this depression is vague. There was no evidence that it was out of the ordinary or inherently dangerous, and there was no showing as to what the county could have done to remedy the defect, other than what it did. The plaintiff's witnesses testified that the county did patch the depression frequently. The failure of evidence here is pre-

cisely the same as that which determined the *Throckmorton* case.

In reaching this conclusion, we disregard entirely the evidence of the defendant. The plaintiff having failed to show wherein the county was remiss in its duty to exercise reasonable care in making the highway safe for ordinary travel, the judgment is reversed and the cause dismissed.

HAMLEY, C. J., MALLERY, HILL, and WEAVER, JJ., concur.

July 16, 1956. Petition for rehearing denied.

