160 N.J. Super. 497 (1978)
390 A.2d 653
GEORGE POLYARD, AS ADMINISTRATOR AD PROSEQUENDUM FOR THE HEIRS AT LAW OF DOROTHY FERREIRA, DECEASED, AND GENERAL ADMINISTRATOR OF THE ESTATE OF DOROTHY FERREIRA, DECEASED, AND HERBERT FERREIRA, PLAINTIFFS-RESPONDENTS,
v.
DAVID TERRY, JOYCE HEIL, DEFENDANTS, AND STATE OF NEW JERSEY, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued May 22, 1978.
Decided June 27, 1978.
*500 Before Judges ALLCORN, HORN and FURMAN.
Mr. Thomas F. Marshall, Deputy Attorney General, argued the cause for appellant (Mr. John J. Degnan, Attorney General, *501 attorney; Mr. William F. Hyland, Former Attorney General; Mr. Stephen Skillman, Assistant Attorney General, of counsel; Mr. George W. Fisher, Deputy Attorney General, and Mr. Thomas F. Marshall, Deputy Attorney General, on the brief).
Mr. Joseph L. Kramer argued the cause for respondents (Mr. J. Howard Solomon, on the brief).
The opinion of the court was delivered by HORN, J.A.D.
This is another in the proliferating number of highway accident cases wherein the alleged negligence of the New Jersey Department of Transportation (State) alone or in conjunction with the alleged negligence of others is projected as a basis for recovery against the State.
In this case the accident occurred on August 25, 1974 on Route 4 in Hackensack, a short distance west of the Hackensack River Bridge traversed by said highway. At the time of the accident Herbert Ferreira, his wife Dorothy and son Herbert, Jr. were traveling eastbound on Route 4 in the family car. Defendant David Terry drove his passenger vehicle across the Hackensack River Bridge, moving in the center lane of the three westbound lanes. About 300 feet beyond the bridge he swerved to the left, mounted the 19-inch-high concrete median barrier, proceeded into the eastbound side of the highway and crashed head-on into the Ferreira car. After the initial collision a van driven by defendant Joyce Heil collided with the rear of the Ferreira car. Mr. Ferreira was injured. Mrs. Ferreira died four hours later in Hackensack Hospital. The action was brought by Herbert Ferreira for his injuries, and by George Polyard as general administrator and administrator ad prosequendum of the estate of Dorothy Ferreira against Terry, Heil and the State of New Jersey. Defendants respectively cross-claimed against each other.
Prior to the trial plaintiffs settled with Terry and stipulated to the dismissal of their action against him.
*502 Thereafter Terry moved to dismiss the cross-claims of defendants Joyce Heil and the State. On July 9, 1976 the trial judge denied the motion to dismiss and decided that Terry would remain in the case, but would not be liable for any further financial contribution.
Trial before a jury began on November 22, 1976. Terry admitted negligence. On the third day of trial plaintiffs stipulated as to a dismissal of their claim against Heil as the result of a settlement. However, the issue of Heil's negligence was presented to the jury, which exonerated her. At the close of plaintiffs' case the State moved for dismissal, which was denied.
On November 30, 1976 the jury returned a verdict finding Terry 70% negligent and the State 30% negligent. The jury awarded $135,000 in the wrongful death action, $8,949 in the survival action and $15,000 for Herbert Ferreira's injuries. After argument on December 10, 1976 the judge molded the verdicts, crediting the State with amounts received in settlement by Polyard and Herbert Ferreira, and entered judgment against the State for $118,809.68 in the death action, $7,875.25 in the survival action and $4,364.07 for Herbert Ferreira's injuries: in sum, $131,049.
The State moved for judgment n.o.v. or a new trial. On January 28, 1977 the trial judge denied this motion in an oral opinion. Other relief sought by the State was denied for the reasons stated by the judge in his written opinion, Polyard v. Terry, 148 N.J. Super. 202 (Law Div. 1977). The State filed a timely notice of appeal.
An aerial photograph depicts the scene. There are three lanes in the eastbound direction, in which the Ferreiras were riding, paved with macadam. There are also three lanes in the opposite or westerly direction, in which Terry was riding, paved with concrete, with some areas of exposed aggregate (stones). At the time of the accident the opposing lanes were separated by the concrete barrier. Before the trial the judge removed from the case, by entering a summary judgment, the issue of negligence as to the barrier, based on the *503 statutory immunity of the State for negligent design or plan. N.J.S.A. 59:4-6. The basis of liability placed in issue at trial concerned the allegedly negligent condition of the roadway in the westbound lanes, where the surface of Route 4 meets the surface of the Hackensack River Bridge.
There was a Mobil gasoline service station adjacent to the scene of the accident, on the north side of the highway abutting the westbound lanes. The Hackensack River Bridge is 336 feet to the east of the accident scene.
At the time of the accident, Terry testified, he was traveling between 45 and 50 miles an hour  within the speed limit. As he crossed the bridge his car hit a dip in the highway. He noticed a car exiting the Mobil station on his side of the highway. He stepped on his brakes and his car "just swung right over the divider" and into the Ferreira automobile. Everything happened in a split second and Terry did not know if he had turned the wheel.
The car which cut off Terry's car was never identified. An attendant at the gas station from which it pulled out testified that he had just serviced that car, and was standing next to the pumps, looking toward the roadway. He saw Terry's car coming from his left, proceeding straight in the middle lane. Terry was almost in front of him when the customer exiting the station crossed the slow lane into the middle lane. He testified that "as the person from the gas station pulled out, he [Terry] veered toward the fast lane and very quickly." Terry's car went "directly over very quickly into the wall."
Herbert Ferreira said the only thing he could remember about the collision was "the front wheels coming up over that island and from that point on, I don't remember. I blacked out."
A Hackensack patrolman investigated the accident. He found no skid marks made by Terry's car.
Plaintiffs produced expert testimony concerning the condition of the road surface. This disclosed that the bridge surface was concrete. The roadway in the westerly direction *504 was paved with blacktop, referred to as an easer, from the point where it met the bridge for a short distance westerly therefrom. Thereafter it was paved with concrete. The road surface was about 3/8" lower than the bridge surface where the two met. The difference in grade was referred to as a declivity. In October 1974 about six weeks after the accident, a "skin patch" of bituminous material approximately 3/8" in thickness was placed over the easer due to potholes in its surface.
A number of witnesses testified as to the effect of the declivity. A Teaneck patrolman who arrived at the scene shortly after the accident testified that the dip caused cars to bounce as they went over it. He described the rear wheels of a vehicle shown in a photograph proceeding westerly from the bridge as "being compressed into the shock absorbers" by the dip that the front of the vehicle had taken. Another Teaneck police officer, a lifelong friend of Herbert Ferreira, stated that he traveled this portion of Route 4 daily and that his car would "bottom" and scrape the road surface at 50 miles an hour, but he would have no problem at 40 miles an hour. A Hackensack patrolman characterized the declivity as being "slight, you feel a drop." The officer who investigated the accident also characterized the drop as being slight. The gas station attendant stated he never had any difficulty with the easer and gave no thought to it. We will refer to such other portions of the evidence as may be necessary in connection with the issue of liability of the State.
Under its first point the State urges that the trial judge erred in failing to grant its motion for involuntary dismissal or judgment notwithstanding the verdict (judgment n.o.v.) because plaintiffs failed to produce evidence required to support liability under the New Jersey Tort Claims Act, N.J.S.A. 59:1-1 et seq., particularly under N.J.S.A. 59:4-1 and 2. Because we agree that there was a failure to prove two of the required elements of N.J.S.A. 59:4-1 and 2, and such failure is dispositive of the entire case, we *505 will discuss only these two. They are that plaintiffs failed to prove:
A. The area of the highway at which the accident occurred was in a dangerous condition within the meaning of N.J.S.A. 59:4-1.
B. The condition of the highway was the proximate cause of the collision.
Proof of these two elements and the others prescribed in N.J.S.A. 59:4-2 are essential before one may recover damages against a public entity. N.J.S.A. 59:4-2 provides:
A public entity is liable for injury caused by a condition of its property if the plaintiff establishes that the property was in dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:
a. a negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or
b. a public entity had actual or constructive notice of the dangerous condition under section 59:4-3 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.
Nothing in this section shall be construed to impose liability upon a public entity for a dangerous condition of its public property if the action the entity took to protect against the condition or the failure to take such action was not palpably unreasonable.
"Dangerous condition" is defined in N.J.S.A. 59:4-1(a) as "a condition of property that creates a substantial risk of injury when such property is used with due care in a manner in which it is reasonably foreseeable that it will be used."
The same standard governs review of a trial judge's refusal to grant a motion for dismissal at the close of plaintiffs' case, R. 4:37-2(b), and for judgment n.o.v., R. 4:40-2(b): could the evidence, together with legitimate inferences which can be drawn therefrom, sustain a judgment in favor of the party opposing the motion? R. 4:37-2(b). Neither the trial judge nor the appellate court is concerned *506 with the weight, worth, nature or extent of evidence, but must accept as true all the evidence supporting the party opposing the motion, and accord him the benefit of all favorable inferences. Then, if reasonable minds could differ, the motion must be denied. Dolson v. Anastasia, 55 N.J. 2, 5 (1969).
But in applying the stated test the judge must consider the declared legislative policy which shapes the application and interpretation of the Tort Claims Act. See Rappaport v. Nichols, 31 N.J. 188 (1959), in which our Supreme Court said:
We are fully mindful that policy considerations and the balancing of the conflicting interests are the truly vital factors in the molding and application of the common-law principles of negligence and proximate causation. [at 205]
The provisions of the Tort Claims Act, N.J.S.A. 59:4-1 and 2, particularly in the case before us, and also other legislative comment to the act, delineate that policy. Thus comment to N.J.S.A. 59:2-1 states, in part, that it is "intended to insure that any immunity provisions provided in the act or by common law will prevail over the liability provisions. It is anticipated that the courts will realistically interpret both the statutory and common-law immunities in order to effectuate their intended scope." Comment to N.J.S.A. 59:4-2, upon which the State's defense is predicated, includes the following: "This section recognizes the difficulties inherent in a public entity's responsibility for maintaining its vast amounts of public property."
N.J.S.A. 59:1-2 declares that "public entities shall only be liable for their negligence within the limitations of this act and only in accordance with the fair and uniform principles established herein." Accordingly, recovery against a public entity may be had, but only within the strict authority and policies guiding its interpretation. Costa v. Josey, 160 N.J. Super. 1 (App. Div. 1978); Manca v. Hopatcong, 157 N.J. Super. 67, 72 (App. Div. 1978); *507 Setrin v. Glassboro State College, 136 N.J. Super. 329, 335 (App. Div. 1975).
Plaintiff's theory of liability for negligence was that when the Terry car went over the declivity and then over the polished concrete surface the car was unstable, and that when Terry reacted to being cut off the instability of the car contributed to his loss of control.
Plaintiffs rest their evidential support for this concept primarily upon the testimony of their expert, John Lacz, a professional engineer. He testified that he had driven over the spot in question frequently, about 50 to 100 times a year. He inspected the area as part of his investigation. As he drove over the declivity at 40 to 50 miles an hour he felt he was in "a position to lose control of the car." He also stated that potholes in the macadam surface constituted a hazard.[1] He analyzed the cars going over the declivity as being in an unstable position, with greater traction on their rear wheels than on the front wheels. An additional problem was ascribed to the concrete surface of the westbound lanes over which Terry's vehicle traveled before mounting the barrier. He testified that 30% to 40% of that surface was covered with slightly raised aggregate or stone which was smooth and polished, thus having less friction capability. He said that a car going over the declivity at 40 to 50 miles an hour would experience instability which "could" cause loss of control and "possible" accident. It would take three to four seconds to traverse the distance from the declivity to the point where Terry's car went over the median barrier, at 50 miles an hour. He indicated that there was a "strong realm of engineering probability" that Terry lost control of his car due to these conditions in the road. He concluded that the westbound lanes of Route *508 4 needed a coat bituminous paving, which is a better surface in terms of friction characteristics.
A. The area of the highway at which the accident occurred was not in a "dangerous condition" within the meaning of N.J.S.A. 59:4-1.
Obviously not every defect in a highway, even if caused by negligent maintenance, is actionable. N.J.S.A. 59:4-1 requires that the defect create "a substantial risk of injury" when the highway is used with due care "in the manner which it is reasonably foreseeable that it will be used." When a motion for involuntary dismissal is made it requires the trial judge to make a preliminary determination as to whether the alleged condition is in fact a dangerous one within the meaning of the statute. Otherwise the legislatively-decreed restrictive approach to liability would be illusory.
The California Tort Claims Act, Cal. Gov't. Code § 810 et seq., after which our statute was modeled (Setrin, supra 136 N.J. Super. at 334; Keller v. Somerset Cty., 137 N.J. Super. 1, 6 (App. Div. 1975); Danow v. Penn Central Transp. Co., 153 N.J. Super. 597, 601 (Law Div. 1977)), defines "dangerous condition" as "a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used." Section 830 (a). Section 830.2 of the California Code expounds upon the definition and speaks to the situation at hand:
A condition is not a dangerous condition within the meaning of this chapter if the trial or appellate court, viewing the evidence most favorably to the plaintiff, determines as a matter of law that the risk created by the condition was of such a minor, trivial or insignificant nature in view of the surrounding circumstances that no reasonable person would conclude that the condition created a substantial risk of injury when such property or adjacent property was used with due care in a manner in which it was reasonably foreseeable that it would be used. *509 See Pfeifer v. San Joaquin Cty., 67 Cal.2d 177, 60 Cal. Rptr. 493, 430 P.2d 51, 55 (Sup. Ct. 1967).
The use of the phrase "substantial risk" in our act can be taken to mean one that is not minor, trivial or insignificant. Plaintiffs' evidence failed to demonstrate that the risk was substantial. Their expert testimony was vague and, although it would tend to establish that a vehicle might be unstable momentarily by reason of the condition of the highway, it by no means demonstrated that the roadway condition was a "dangerous" one within the intent of N.J.S.A. 59:4-1. Even plaintiffs' witnesses who experienced a dipping or bumping sensation were able to maintain their position in the highway. Such conditions of the highway as shown here  a slight declivity and some exposed aggregate  are not at all uncommon in highways. Travelers on highways must expect some declivities and some areas of imperfect surfaces. An example of the type of condition which might be termed as dangerous is found in Hammond v. Monmouth Cty., 117 N.J.L. 11 (Sup. Ct. 1936). In that case plaintiff, a milkman, while driving his truck, without warning encountered an unprotected excavation in the highway, which permitted the rear wheels of the truck to drop into the excavation and to overturn the vehicle.
There have been numerous cases considering whether the existence of a particular defect in a street or highway is a question for the court or jury. See Annotation, "Highway Defect  Question for Jury," 1 A.L.R.3d 496. None has arisen in this jurisdiction. The cases are greatly divided, with no discernible factor controlling the outcome, such as depth of a depression in a street. See, e.g., cases barring recovery: Snyder v. State Hwy. Comm'r, 139 Kan. 150, 30 P.2d 102 (Sup. Ct. 1934) (court directed judgment for defendant in action based on injuries after auto struck depression extending across roadway, one inch deep, four feet long); Parker v. Skagit Cty., 49 Wash.2d 33, 297 P.2d 620 (Sup. Ct. 1956) (jury verdict for plaintiff reversed, and judgment for defendant entered, where injury caused *510 when car hit gradual depression reaching depth of three to four inches in roadway surface approaching bridge; condition said to recur frequently despite regular repair); Oklahoma City v. Cantrell, 181 Okl. 56, 72 P.2d 381 (Sup. Ct. 1937) (judgment for plaintiff reversed, judgment entered in favor of defendant, where injury occurred when auto hit dip in street six feet wide, up to six inches deep; no complaints had been made about this condition in at least seven years); Aldi v. S.A. Scullen Co., 249 App. Div. 670, 291 N.Y.S. 382 (Ct. App. 1936) (Complaint dismissed where injury caused when car hit a stone about four inches in diameter, then hit hole about eight or nine inches deep; defects said to be too trivial to hold town liable).
Although the same annotation mentions cases allowing recovery for comparatively insignificant highway defects, we are constrained to the view already stated, because the case at hand is distinguishable from all out-of-state cases by reason of the more stringent burden imposed by our Tort Claims Act  that of establishing the existence of a dangerous condition which creates a substantial risk of injury.
Each case where the issue arises must be pragmatically examined by the judge, to determine whether the particular highway irregularities were such that reasonable minds could differ as to whether they manifested that the highway was in a dangerous condition.
We conclude in the exercise of our judicial function that there was insufficient evidence to warrant the submission of the issue of whether the highway was in a dangerous condition under the definition of the Tort Claims Act, N.J.S.A. 59:4-1. Accordingly, the judge should have granted defendant's motion for involuntary dismissal or judgment n.o.v. Dolson v. Anastasia, supra.
B. The condition of the highway was not shown to have been the proximate cause of the collision.
The opinion of an expert is undoubtedly admissible, and usually useful, when, as here, a road-surface *511 characteristic is not so pronounced that its effect upon the control of an automobile is obvious. Evid. R. 56(2). And it is "within the special function of a jury to decide if the facts on which the answer of an expert is based actually exists, and the value or the weight of the testimony of the expert is dependent upon and no stronger than the facts on which it is predicated." Mohr v. B.F. Goodrich Rubber Co., 147 N.J. Super. 279, 284 (App. Div. 1977), certif. den. 74 N.J. 281 (1977). However, such opinions, when without basis, may be found by a trial or reviewing court to be "not worthy of consideration." Jakubowski v. Minnesota Mining and Mfg. Co., 42 N.J. 177, 187 (1964).
Proximate cause has been defined as "any cause which in the natural and continuous sequence, unbroken by an efficient intervening cause, produces the result complained of and without which the result would not have occurred." Fernandez v. Baruch, 96 N.J. Super. 125, 140 (App. Div. 1967), rev'd on other grounds, 52 N.J. 127 (1968). An act or omission is not regarded as the cause of an event if the event would have occurred without it. Kulas v. Public Service Elec. and Gas Co., 41 N.J. 311, 317 (1964). If a negligent act was a substantial factor in bringing about the injuries, a foreseeable intervening cause or one which was the normal incident of the risk created does not relieve the tortfeasor of liability. Rappaport v. Nichols, supra 31 N.J. at 203. Here also, as already stated, policy considerations and the balancing of conflicting interests are vital factors in application of principles of proximate causation. Id. at 205.
The opinion of plaintiffs' expert dealt substantially in possibilities and operated on the hypothesis that the declivity, small stones on the highway (loose aggregate) and small uneven surfaces were responsible for the instability of Terry's vehicle. It was conjectural as to whether the uneven surface of the highway was in the direct area where Terry applied the brakes of his vehicle. Although a Hackensack patrolman testified there were no skid marks, a photograph *512 discloses that there was a very small one close to the divider  probably made just before the vehicle went over the barrier, indicating that his car was leaning hard to the left, which could be caused by a hard left turn. It seems clear that this accident would have occurred without the presence of the declivity.
A distillation of the liability evidence makes it manifestly clear that "Terry * * * turned his wheel into the divider when startled by a car exiting from a gas station and headed toward his car's right side.[2] Terry's testimony was vague and uncertain. He didn't know whether he "slammed on" his brakes or merely touched them. He didn't know whether he turned the wheel of his car in any direction.
Terry's natural instinct on seeing the approaching vehicle would be to turn his vehicle to his left, in order to avoid a collision. Bearing in mind the comparatively short distance between the barrier and his automobile when he reacted, it is more than likely that he could not stop his vehicle in the short space available, so that it proceeded into and over the barrier. Here also we are unable to conclude that reasonable minds could differ in finding that the condition of the highway was not a factor in the cause of the collision. We view the highway condition only as an attending circumstance which was in no way a contributing cause.
In view of the foregoing, we determine that the trial judge erred in submitting the issue of the State's negligence to the jury. Accordingly, the judgment is Reversed. No costs.
NOTES
[1] Although described as "potholes," photographs taken several days later show only that actually there were several comparatively small areas in the macadam where the concrete subsurface was exposed.
[2] Quoted from the trial judge's opinion reported in the instant case, Polyard v. Terry, 148 N.J. Super. 202, 205 n. 2 (Law Div. 1977).