SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**Thomas J. Stewart v. New Jersey Turnpike Authority (A-61/62-20) (085416)**

**Argued November 8, 2021 -- Decided February 9, 2022**

**SOLOMON, J., writing for a unanimous Court.**

In this appeal, the Court considers whether plaintiffs' premises liability claim under N.J.S.A. 59:4-2 of the New Jersey Tort Claims Act (TCA) should survive summary judgment after plaintiffs belatedly altered their factual theory of liability.

In Spring 2015, plaintiffs Thomas and Julie Stewart were injured when they lost control of their motorcycle while riding over a Garden State Parkway overpass. Thomas testified that, after he and his wife passed through the Toms River toll plaza, their bike began to "shimmy," and Thomas suspected that he had suffered a flat tire. As they tried to pull over, they crossed the expansion joint between the roadway and the bridge, and the bike's back end bounced up and ejected Julie. Thomas then let go of the bike, slid to the ground, and both he and Julie suffered serious injuries.

A friend who had been riding with plaintiffs claimed in a deposition to have observed a "piece of metal . . . between the asphalt and concrete bridge," which is where the accident occurred. Plaintiffs filed a complaint against defendants, the New Jersey Turnpike Authority (the Authority) and Earle Asphalt (Earle), one of the Authority's paving and roadwork contractors, for their alleged negligence in reconstructing the overpass, which had recently reopened. Plaintiffs alleged that they lost control of the motorcycle when they struck a piece of metal in the bridge's expansion joint that jutted out of the roadway (the joint theory).

The parties engaged in over two years of discovery, with plaintiffs requesting extensions seven times. During argument before the trial court on defendants' joint motion for summary judgment, plaintiffs changed their theory of liability. They argued, for the first time, that defendants failed to properly pave a portion of roadway on the overpass, leaving a height differential in the pavement (the asphalt theory). Under the newly asserted asphalt theory, plaintiffs alleged that it was the height differential in the roadway, rather than the joint, that caused them to lose control of the motorcycle.

The trial court distinguished the joint theory from the asphalt theory and considered only the joint theory. The trial court found that plaintiffs failed to allege a

1

disputed fact as to any of the required elements for negligence under N.J.S.A. 59:4-2. Accordingly, the trial court found that the Authority was entitled to immunity under the TCA and that Earle was entitled to derivative immunity.

The Appellate Division reversed. Conflating the joint and asphalt theories and relying on the friend's testimony about the protruding object, the appellate court found disputed issues of fact as to whether the alleged height differential created a dangerous condition under the TCA. The court also concluded that Earle had not demonstrated that it was entitled to claim derivative immunity.

The Court granted certification. 246 N.J. 314 (2021); 246 N.J. 326 (2021).

**HELD:** The Court agrees with the trial court that plaintiffs' new theory should not have been considered given its late presentation. The Court nonetheless holds, for completeness, that plaintiffs' new theory did not raise an issue of material fact. The Court reinstates summary judgment in favor of defendants and dismisses the complaint with prejudice. The Court also finds that Earle is entitled to derivative immunity.

1. Application of the summary judgment standard here must account for the fact that under the TCA, immunity of public entities from tort liability is the general rule and liability is the exception. A public entity's liability for injuries to those traveling on its roadways depends upon several elements; if one or more of those elements is not satisfied, a claim of liability must fail. The element at issue in this appeal is whether plaintiffs established the existence of an issue of material fact regarding whether there was a dangerous condition on the overpass. See N.J.S.A. 59:4-1(a). (pp. 14-15)

2. As to derivative liability, where a public entity provides plans and specifications to an independent contractor, the public contractor will not be held liable for work performed in accordance with those plans and specifications. (p. 16)

3. The Court agrees with the trial court that the asphalt theory was not properly raised and finds that summary judgment was appropriate on that ground alone. (p. 17)

4. Nevertheless, for completeness, the Court notes that it does not find that either of the two items of evidence to which plaintiffs point establishes the existence of an issue of material fact on the asphalt theory. First, the friend's testimony that something metal appeared in the roadway may have supported the now-abandoned joint theory, but it does not substantiate the asphalt theory. Second, the photographs on which plaintiffs rely -- which were supplied by defendants -- do not appear to show a height differential in the roadway, and plaintiffs do not present any competent evidence demonstrating that the photographs do show a height differential. In short, plaintiffs do not present anything to rebut defendants' evidence that there was no height differential in the roadway, metal or asphalt. (pp. 18-20)

2

5.  The Authority's project supervisor explained that the Authority regularly inspected Earle's work and confirmed that Earle constructed the overpass in accordance with the Authority's plans.  Additionally, Earle's corresponding progress reports were submitted in support of defendants' joint motion for summary judgment.  Derivative immunity is appropriate because it is uncontroverted that Earle performed in accordance with the Authority's plans and specifications.  (pp. 20-21)

**REVERSED.  Summary judgment in favor of defendants is REINSTATED.**

**CHIEF JUSTICE RABNER and JUSTICES ALBIN, PATTERSON, FERNANDEZ-VINA, and PIERRE-LOUIS join in JUSTICE SOLOMON's opinion.**

3

# SUPREME COURT OF NEW JERSEY
## A-61/62 September Term 2020
## 085416

Thomas J. Stewart and Julie Stewart,

Plaintiffs-Respondents,

v.

New Jersey Turnpike Authority/
Garden State Parkway and Earle Asphalt,

Defendants-Appellants,

and

Stavola Contracting Company and
George Harms Construction,

Defendants.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|---|---|
| November 8, 2021 | February 9, 2022 |

Dawn Attwood argued the cause for appellants New Jersey Turnpike Authority/Garden State Parkway (Pashman Stein Walder Hayden, attorneys; Dawn Attwood, and Jason D. Attwood, on the briefs).

Fay L. Szakal argued the cause for appellant Earle Asphalt (GluckWalrath, attorneys; Fay L. Szakal, of counsel and on the briefs).

1

Steven L. Kessel argued the cause for respondents (Drazin & Warshaw, attorneys; Steven L. Kessel, on the briefs).

William J. Rudnik argued the cause for amici curiae New Jersey State League of Municipalities and the New Jersey Institute of Local Government Attorneys (Gebhardt & Kiefer, attorneys; Richard P. Cushing, and Kelly A. Lichtenstein, on the brief).

JUSTICE SOLOMON delivered the opinion of the Court.

This appeal requires us to determine whether plaintiffs' premises liability claim under N.J.S.A. 59:4-2 of the New Jersey Tort Claims Act (TCA), N.J.S.A. 59:1-1 to 12-3, should survive summary judgment after plaintiffs belatedly altered their factual theory of liability.

Plaintiffs were injured when they lost control of their motorcycle while riding over a Garden State Parkway overpass. They brought this action against defendants, the New Jersey Turnpike Authority and several of its paving and roadwork contractors, including Earle Asphalt, alleging that they lost control of the motorcycle when they struck a piece of metal in the bridge's expansion joint that jutted out of the roadway.

The parties engaged in over two years of discovery, with plaintiffs requesting extensions seven times. During argument before the trial court on defendants' joint motion for summary judgment, plaintiffs changed their

2

theory of liability. They argued, for the first time, that defendants failed to properly pave a portion of roadway on the overpass, leaving a height differential in the pavement. Under that newly asserted theory, plaintiffs alleged that it was the height differential in the roadway, rather than the joint, that caused them to lose control of the motorcycle.

The trial court declined to consider that newly minted theory and granted summary judgment to the Authority on its immunity defense and to Earle on its derivative immunity defense. The Appellate Division reversed, finding a genuine issue of material fact existed based on the testimony of one of the motorcyclists who accompanied plaintiffs and claimed to have seen a piece of metal in the roadway.

We now reverse the Appellate Division's judgment. We agree with the trial court that plaintiffs' new theory should not have been considered given its late presentation. Nonetheless, for completeness, we hold that plaintiffs' new theory also did not raise an issue of material fact. We therefore reinstate the trial court's grant of summary judgment in favor of defendants and dismiss the complaint with prejudice.

I.

A.

The summary judgment record reveals that on a spring day in 2015, plaintiffs Thomas and Julie Stewart were riding Thomas' motorcycle on the Garden State Parkway. Thomas was operating the motorcycle and Julie was the passenger. The two were accompanied by several friends on their own motorcycles. With Thomas and Julie leading, the group rode northbound on the Parkway and passed through the Toms River toll plaza in the leftmost lane heading toward the overpass.

Defendant, the New Jersey Turnpike Authority, had just reopened the overpass after its codefendant, Earle Asphalt, finished a reconstruction project. Andrew McConnell, the Authority's project supervisor, explained in his deposition that, where it connects to the asphalt roadway, the overpass consists of two sections. First, a concrete block abuts the asphalt roadway -- "the header," as McConnell called it -- after which there is the remainder of the concrete bridge. Between the header and the rest of the bridge lies a metal expansion joint. Such joints are included in roadway bridges, among other structures, to accommodate shrinkage and expansion due to variations in the temperature. Thus, as McConnell explained, a car crossing the overpass in the manner the Stewarts did would begin on asphalt roadway, cross onto the

4

concrete header, cross the metal expansion joint, and then proceed across the rest of the concrete bridge.

Dominic Salsa, Earle's project engineer, explained in his deposition that Earle gradually tapered the surface of the roadway approaching the overpass to correct any change in the height by putting down what is known as a transition layer. He further explained that if Earle had not put down this layer, there would have been a two-inch height differential in the roadway where the asphalt met the concrete. By the time of the accident, the only step in reconstruction of the overpass that remained was removal of the transition layer and its replacement with a smoother final layer; that final step would not have affected the tapering.

At some point after the toll plaza, Thomas testified that his bike began to "shimmy." Jordan Vergara, one of the other riders, saw an object he described as black and about the size of a phone fall off Thomas' bike. Thomas suspected that he had suffered a flat tire. Thomas' bike began what he described as a "death wobble," during which Thomas struggled to control the bike as its front and rear end lurched in and out. Thomas attempted to pull over to the side of the road, but when he crossed the expansion joint, the bike's back end bounced up and ejected Julie. Thomas then let go of the bike, slid to the ground, and both he and Julie suffered serious injuries.

5

In his deposition, Vergara claimed to have observed a "piece of metal . . . between the asphalt and concrete bridge," which is where the accident occurred. He guessed this was a "gap" that caused the accident. Although he never measured it or took any photographs of it, he opined that it looked "higher than normal." Vergara crossed the overpass himself without incident, and the Authority received no complaints from any other drivers regarding the overpass despite its heavy use. Vergara also stated that he reported the gap to the police, but the police report in the record does not reflect any such observation.

B.

The Stewarts filed a complaint against the Authority and several of its contractors, including Earle, for their alleged negligence in reconstructing the overpass. All parties other than the Authority and Earle were voluntarily dismissed from the case pursuant to Rule 4:37-1(a), after which the Stewarts filed an amended complaint alleging that "a steel strip that projected above the surface placed there in connection with repaving work . . . caus[ed] [Thomas] to lose control of the motorcycle and crash" and that defendants "negligently allowed a dangerous condition to exist on the roadway, specifically debris evidently a steel strip, which condition was the proximate cause of the crash."

After 757 days of discovery and seven discovery extensions, the only evidence supporting any height differential in the roadway was Vergara's unsupported assertion that the expansion joint "looked higher than normal." Defendants jointly moved for summary judgment, supported by photographs of the overpass taken two weeks after the accident, progress reports, and deposition testimony and certifications from McConnell and Salsa, all of which set forth the work that had been done, the timing of the work, and asserted that no work had been done on the overpass between the accident and the taking of the photographs. Defendants asserted that evidence demonstrated that there was no defect in the expansion joint. They further contended that no one had complained about the overpass despite the many vehicles that had traversed it since its reopening.

In response to defendants' joint statement of material facts, the Stewarts admitted that defendants had not done any work on the overpass between the day of the accident and the day the photos were taken, but they still objected to the use of the photos use at oral argument before the trial court, claiming an insufficient foundation to demonstrate that the photos reflected the condition

of the overpass on the day of the accident.  They also admitted that the transition layer was in place on the day of the accident.[1]

At the hearing on defendants' motion for summary judgment, the Stewarts -- for the first time -- argued that there was a height differential between the asphalt roadway and the concrete header, apparently abandoning the joint theory with which they began this litigation.[2]  The trial court distinguished the joint theory from the asphalt theory and noted that the Stewarts failed to allege any issue with the asphalt in their discovery disclosures and that the complaint only alleged that something metal protruded from the roadway and caused the accident.  The Stewarts argued before the trial court that their pleadings should conform to the evidence, but the court rejected their assertion, concluding that allowing the Stewarts to raise the asphalt theory would be prejudicial to defendants.  The court reviewed Vergara's deposition testimony and determined that his observations were only

---

[1]  The Stewarts now aver -- without any support -- that this admission was in error but acknowledge that they are bound by that admission given their failure to correct it.  See R. 4:22-2.

[2]  To avoid confusion, we refer to the Stewarts' first theory alleging a metal protrusion from the expansion joint as the joint theory and refer to the Stewarts' second theory alleging a height differential in the roadway due to improper paving as the asphalt theory.

relevant to the joint theory, finding that no witness described any issue with the pavement.

Thus, the trial court -- only considering the joint theory -- found that the Stewarts failed to allege a disputed fact as to any of the required elements for negligence under N.J.S.A. 59:4-2. Accordingly, the trial court found that the Authority was entitled to immunity under the TCA and that Earle was entitled to derivative immunity because McConnell stated that Earle had performed in accordance with the Authority's plans.

C.

The Appellate Division reversed the trial court's judgment in an unpublished opinion. It noted that "[t]he parties sometimes referred to the divider, as an expansion joint or an acclivity in the surface of the road," conflating the joint and asphalt theories.[3] Accepting Vergara's testimony -- which supported the joint theory that the Stewarts had abandoned rather than the asphalt theory -- the Appellate Division found disputed issues of fact as to whether the alleged height differential created a dangerous condition under the TCA. The court found that defendants' witnesses did not have personal

---

[3] Because of its conflation, the Appellate Division did not address the fact that the trial court did not consider the asphalt theory because it was raised too late into the litigation, instead considering it the Stewarts "revised theory of liability."

9

knowledge of the roadway's condition nor did defendants submit documentary evidence that showed that the roadway was properly tapered. It thus concluded that regardless of its cause, the issue of whether the alleged height differential was a dangerous condition under the TCA should have gone to a jury. The court then reasoned that if the Stewarts could prove a dangerous condition existed, a jury could find that the condition was the proximate cause of the accident. On the issue of notice, the court found that if a height differential could have existed, it might also have been open and obvious enough that defendants should have been aware of it.[4]

As to Earle's derivative immunity defense, the Appellate Division found that it failed to "present any approved plans or designs" and failed to "present evidence [that] the transition or intermediary layer . . . was incorporated into any approved plans and that it followed such plans." Accordingly, the court concluded that Earle had not demonstrated that it was entitled to claim derivative immunity.

We granted defendants' petitions for certification, 246 N.J. 314 (2021); 246 N.J. 326 (2021), and allowed the New Jersey League of Municipalities and

---

[4] All parties agree that the failure to prove one element of a negligence claim under the TCA is fatal to the claim. See Polzo v. County of Essex, 196 N.J. 569, 585 (2008). Thus, we only address their arguments as to the first element: whether the overpass was a dangerous condition.

10

the New Jersey Institute of Local Government Attorneys (collectively, NJLM) to jointly participate as amici.

## II.

The Authority argues that the Appellate Division erroneously concluded that the Stewarts provided evidence of a dangerous condition under the TCA because the Stewarts were required to present expert evidence to that effect. The Authority also asserts that the Appellate Division disregarded clear photographic evidence that contradicts the Stewarts' contention that there was a height differential in the roadway. In addition, the Authority contends that neither Vergara nor any other witness supports the Appellate Division's conclusion, now asserted by the Stewarts, that Earle failed to properly pave a portion of the roadway by not putting down the transition layer of asphalt, and thus the Stewarts' height differential theory must fail.

Earle echoes many of the Authority's arguments, contending that the Appellate Division erroneously conflated the Stewarts' two theories of liability in reversing the trial court's judgment. Given that the Stewarts consistently asserted that a "steel strip" was the alleged defect, Earle submits that defendants had no notice regarding the Stewarts' claim that the roadway had not been tapered properly. Earle further argues that consideration of the new theory of liability asserted at the time of argument on the motion for summary

11

judgment would substantially prejudice both defendants. Even so, Earle asserts that the photographic evidence belies Vergara's testimony, as the photos conclusively show no height differential in the roadway. Thus, Earle contends that there are no genuine issues of material fact as to the asphalt theory.

Earle additionally argues that the Appellate Division erred in denying it derivative immunity for failing to present any plans approved by the Authority that included the alleged defect. Earle contends that the defect the Stewarts now allege could not have existed and thus could not have appeared in any plans. Earle points us to cases holding that compliance with written or verbal directions from a public entity is sufficient to obtain derivative immunity.

NJLM echoes defendants' arguments that the Stewarts belatedly changed their theory because their original theory was not viable, and that Vergara's testimony is not competent evidence and accordingly does not create a genuine dispute of a material fact. NJLM further argues that the Appellate Division improperly shifted the burden of proof to defendants by rejecting Earle's inspection reports and finding without any evidence that Earle may have negligently inspected the overpass.

The Stewarts respond that their reliance on the presence of a height differential between the asphalt pavement and the expansion joint is not a

different legal theory but a change in the factual basis of their argument that the overpass was a dangerous condition. They further assert that defendants failed to provide the testimony of a witness with personal knowledge that there was no height differential in the roadway to rebut Vergara's observation of a differential. Regarding the photos of the overpass, the Stewarts assert that defendants failed to lay the proper foundation that the photos represent the condition of the Parkway on the day of the accident and argue that, in any event, the photos do not accurately represent the overpass on the day of the accident because Earle took them after it finished working on the bridge.

Regarding derivative immunity, the Stewarts argue that Earle must identify the specific instruction it followed when it failed to properly taper the roadway. They further allege that, because the Authority is not immune, Earle cannot derivatively benefit from the Authority's immunity.

### III.

In this appeal, we consider a motion for summary judgment in the TCA context. As we would in any tort case, we review a grant of summary judgment de novo, applying the same standard as the trial court. Woytas v. Greenwood Tree Experts, Inc., 237 N.J. 501, 511 (2019). That is, when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

13

any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law," summary judgment is appropriate. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 528-29 (1995) (quoting R. 4:46-2). But we must not "ignore the elements of the cause of action or the evidential standard governing the cause of action." Bhagat v. Bhagat, 217 N.J. 22, 38 (2014).

The Legislature passed the TCA after this Court abolished the common law doctrine of sovereign immunity in Willis v. Department of Conservation & Economic Development, 55 N.J. 534, 540-41 (1970). Vincitore ex rel. Vincitore v. N.J. Sports & Exposition Auth., 169 N.J. 119, 124 (2001). In doing so, the Legislature provided that public entities could only be held liable for negligence "within the limitations of [the TCA]." N.J.S.A. 59:1-2.

Application of the summary judgment standard here must therefore account for the fact that under the TCA, "immunity [of public entities] from tort liability is the general rule and liability is the exception." Coyne v. Dep't of Transp., 182 N.J. 481, 488 (2005) (quoting Garrison v. Township of Middletown, 154 N.J. 282, 286 (1998)); see N.J.S.A. 59:1-2. Thus, "[w]hen both liability and immunity appear to exist, the latter trumps the former." Tice v. Cramer, 133 N.J. 347, 356 (1993).

14

Under the TCA, a public entity's liability for injuries to those traveling on its roadways depends upon establishment of the following:

> a plaintiff must establish the existence of a "dangerous condition," that the condition proximately caused the injury, that it "created a reasonably foreseeable risk of the kind of injury which was incurred," that either the dangerous condition was caused by a negligent employee or the entity knew about the condition, and that the entity's conduct was "palpably unreasonable."
>
> [Vincitore, 169 N.J. at 125 (quoting N.J.S.A. 59:4-2).]

These elements are "accretive; if one or more of the elements is not satisfied, a plaintiff's claim against a public entity alleging that such entity is liable due to the condition of public property must fail." Polzo v. County of Essex, 196 N.J. 569, 585 (2008). At issue in this appeal is whether the Stewarts established the existence of an issue of material fact regarding whether there was a dangerous condition on the overpass.

N.J.S.A. 59:4-1(a) defines a "dangerous condition" as "a condition of property that creates a substantial risk of injury when such property is used with due care in a manner in which it is reasonably foreseeable that it will be used." A substantial risk is "one that is not minor, trivial or insignificant," and presents a more stringent burden than that of mere negligence. Kolitch v. Lindedahl, 100 N.J. 485, 493 (1985) (quoting Polyard v. Terry, 160 N.J. Super. 497, 509 (App. Div. 1978), aff'd o.b., 79 N.J. 547 (1979)).

15

Independent contractors, such as Earle, "share to a limited extent the immunity of public entities with whom they contract." Vanchieri v. N.J. Sports & Exposition Auth., 104 N.J. 80, 85 (1986). Where, for example, "a public entity provides plans and specifications to an independent contractor, the public contractor will not be held liable for work performed in accordance with those plans and specifications." Id. at 86. Thus, if a contractor does "not deviate[] independently and negligently from that contract," then it is entitled to derivative immunity. Ornes v. Daniels, 278 N.J. Super. 536, 541-42 (App. Div. 1995). Immunity is an affirmative defense, and the party asserting immunity carries both the burden of production and persuasion. Vanchieri, 104 N.J. at 87.

IV.

A.

In applying the familiar summary judgment standard to the Stewarts' theory of liability, we reiterate that they have abandoned the joint theory -- that a height differential at the expansion joint caused their injuries. Before us, the Stewarts assert that defendants failed to demonstrate that Earle put down the transition layer thus leaving a height differential where the asphalt meets the concrete header that caused the accident -- despite their contradictory admission. They argue that the height differential in the asphalt

16

theory is the "dangerous condition" required to impose liability under the TCA.

We agree with the trial court that the asphalt theory was not properly raised and find that summary judgment was appropriate on that ground alone. See Lynch v. Galler Seven-Up Pre-Mix Corp., 74 N.J. 146, 150-51 (1977) (per curiam) (finding no abuse of discretion when the trial court denied plaintiffs' motion to amend because the new theory was "totally at variance with their pretrial discovery disclosures and the evidence"); R. 4:9-2 (permitting parties to amend their pleadings to conform to the evidence presented unless the objecting party demonstrates that such a change would be prejudicial to it).

Defendants could not reasonably anticipate that the Stewarts were going to change their theory of liability given that they failed to mention anything regarding the pavement in their complaint or throughout the 757 days of discovery. See Bauer v. Nesbitt, 198 N.J. 601, 610 (2009) ("Although '[a]ll pleadings shall be liberally construed in the interest of justice,' the fundament of a cause of action, however inartfully it may be stated, still must be discernable within the four corners of the complaint." (quoting R. 4:5-7)). Consideration of that new theory at the eleventh hour "would have redounded to the prejudice of defendants." Lynch, 74 N.J. at 151. We do not suggest that parties cannot revise their theories throughout the litigation process. But a

17

change in theory as fundamental and belated as the one here cannot be countenanced.

Nevertheless, for completeness, we address whether there is a triable issue of material fact with respect to the asphalt theory -- whether the asphalt was improperly tapered. To establish the existence of an issue of material fact on that theory, the Stewarts point to two items of evidence -- Vergara's observations and the photo provided by Earle. We believe that neither creates an issue of material fact.

First, although Vergara's observation that something metal appeared in the roadway may have supported the now-abandoned joint theory, that the metal expansion joint caused the height differential, it does not substantiate the asphalt theory that the Stewarts now allege -- that the failure to taper the roadway by not applying a transition layer caused a height differential in the asphalt. Indeed, all of their discovery disclosures consistently refer to some sort of metal protrusion rather than anything having to do with how the roadway was paved. The trial court recognized this distinction when it granted summary judgment for defendants.

In addition, according to the Stewarts' counsel only, the photographs show that the overpass was a dangerous condition. It is axiomatic that counsel's arguments do not constitute evidence. See DeHanes v. Rothman,

18

158 N.J. 90, 95-96 (1999); Model Jury Charges (Civil), 1.11A "Preliminary Charge: Role of Jury, Judge and Attorneys" (rev. May 2007). Indeed, on observation, the photographs, which were supplied by defendants in support of their motion for summary judgment rather than by the Stewarts in opposition to the motion, do not appear to show a height differential in the roadway. Nevertheless, irrespective of what counsel for either side claims that the photographs show, the Stewarts do not present any competent evidence -- expert or otherwise -- demonstrating that the photographs show a height differential in the roadway.[5] Here, the photographs alone do not create an issue of material fact.

Also, records submitted by defendants, the parties asserting immunity and who bear the burden of proving entitlement to immunity, see Vanchieri, 104 N.J. at 87, including progress reports and testimony from both the project engineer and project supervisor, demonstrate that there was no height differential in the roadway, metal or asphalt. The Stewarts do not present anything to rebut those records.

Because we find that the Stewarts fail to establish an issue of material fact with respect to the first element of their TCA premises liability claim --

_____

[5] Vergara, the only person who claims to have seen any defect, did not view the photos or explain how they relate to what he saw on the day of the accident.

19

that the overpass was a dangerous condition -- and the failure to prove one element of a negligence claim under the TCA is fatal, we need not address the other elements of the Stewarts' TCA claim. See Polzo, 196 N.J. at 585. As "immunity . . . is the general rule and liability is the exception," we find that the Authority has met its burden and is accordingly entitled to immunity under the TCA. Coyne, 182 N.J. at 488 (quoting Garrison, 154 N.J. at 286); see N.J.S.A. 59:2-1.

## B.

As to the Stewarts' assertions that Earle was negligent, we find that Earle is entitled to derivative immunity. McConnell, the Authority's project supervisor, explained that the Authority regularly inspected Earle's work and confirmed that Earle constructed the overpass in accordance with the Authority's plans. Additionally, Earle's corresponding progress reports were submitted in support of defendants' joint motion for summary judgment. Thus, derivative immunity is appropriate because it is uncontroverted that Earle "performed in accordance with [the Authority's] plans and specifications." Vanchieri, 104 N.J. at 86; see also N.J.S.A. 59:4-6; Ciambrone v. Dep't of Transp., 233 N.J. Super. 101, 107 (App. Div. 1989) (affirming summary judgment where a New Jersey Department of

20

Transportation official certified that an allegedly defective condition was approved "by the appropriate employee of the D.O.T.").

## V.

The judgment of the Appellate Division is reversed and the trial court's grant of summary judgment in favor of defendants reinstated.


CHIEF JUSTICE RABNER and JUSTICES ALBIN, PATTERSON, FERNANDEZ-VINA, and PIERRE-LOUIS join in JUSTICE SOLOMON's opinion.