**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2866-22

ALFRED H. BURR and
ALYSSA BURR, H/W,

      Plaintiffs-Appellants/
      Cross-Respondents,

v.

NEW JERSEY TURNPIKE
AUTHORITY, MIDLANTIC
CONSTRUCTION, LLC,
JACOBS ENGINEERING
GROUP, INC.,

      Defendants-Respondents,

and

URBAN ENGINEERS, INC.,

      Defendant-Respondent/
      Cross-Appellant,

and

C.J. HESSE, INC. and
THE HESSE COMPANIES,

      Defendants.

_____

Argued December 5, 2024 – Decided December 16, 2024

Before Judges Mawla, Natali, and Walcott-Henderson.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Docket No. L-1997-16.

Michael A. Gibson argued the cause for appellants/cross-respondents (D'Arcy Johnson Day, attorneys; Michael A. Gibson, on the briefs).

Joseph T. Ciampoli argued the cause for respondent/cross-appellant Urban Engineering, Inc. (Thompson Becker, LLC, attorneys; Joseph T. Ciampoli, of counsel and on the briefs).

Rudy S. Randazzo argued the cause for respondent Jacobs Engineering Group, Inc. (Riker Danzig, LLP, attorneys; Stuart M. Lederman, of counsel and on the brief; Rudy S. Randazzo and David M. Stewart, on the brief).

Lucas Klirsfeld argued the cause for respondent Midlantic Construction, LLC (Marks, O'Neill, O'Brien, Doherty & Kelly, PC, attorneys; William D. Buckley, on the brief).

Thomas A. Abbate argued the cause for respondent New Jersey Turnpike Authority (Decotiis, Fitzpatrick, Cole & Giblin, LLP, attorneys; Thomas A. Abbate, of counsel; Paul J. Miller, on the brief).

PER CURIAM

On September 12, 2015, plaintiff Alfred H. Burr was injured in a motor vehicle accident while riding his motorcycle in the left southbound lane of the Garden State Parkway as he approached an overpass. He lost control of the motorcycle and crashed into the median barrier. His civil engineering expert attributed the accident to an existing dangerous condition on the roadway, namely a change in the elevation of the roadway at the abutment joint between the pavement and the bridge.

Alfred[1] and his wife, Alyssa, sued New Jersey Turnpike Authority (NJTA), which owns the Parkway, Urban Engineers, Inc., Jacobs Engineering Group, Inc., and Midlantic Construction, LLC. They alleged defendants were negligent in their inspection and maintenance of the roadway by allowing the dangerous condition to exist, which caused Alfred's accident.

On appeal, plaintiffs challenge an April 10, 2023 order granting all defendants summary judgment following an N.J.R.E. 104 hearing barring the admission of plaintiffs' liability expert's opinion on grounds of a net opinion. Plaintiffs also challenge the granting of summary judgment to NJTA by ruling their claims were governed by the Tort Claims Act (TCA), N.J.S.A. 59:1-1 to

---

[1]  We use plaintiffs' first names where necessary to distinguish them because they share a common surname. We intend no disrespect.

A-2866-22

12:13, and for failing to set forth a cause of action under the TCA. They also urge us to find error because the trial court granted summary judgment without oral argument.

Plaintiffs first named Urban in their fourth amended complaint, which was filed in 2019, three years after the initial complaint. Urban moved for summary judgment, arguing plaintiffs' claims were time-barred. On April 27, 2019, the trial court denied Urban's motion, and Urban cross-appeals from that order.

We affirm on the appeal and the cross-appeal. The salient facts follow.

I.

Alfred's accident occurred while he was riding his motorcycle accompanied by his friend, who also was on a motorcycle behind Alfred in the same lane, and Alyssa following along in a car behind both motorcycles. Alfred lost control of his motorcycle as he reached the bridge deck of an overpass over Route 30 in Atlantic County. He testified he felt a "severe smack"—as if the motorcycle had "lifted then dropped"—felt the motorcycle shake, heard a "bang," and lost control of "the rear end of the" motorcycle. He "slammed" against the concrete barrier, his foot was caught between his motorcycle and the median as the motorcycle continued moving forward, injuring his leg.

A-2866-22

Alfred testified he had "no idea" what caused his motorcycle to lose control. He never saw anything on the road, including a pothole or debris. Alfred claimed he "hit something" that caused his motorcycle to bounce and said his rear tire was flat afterwards. He assumed the bang and the drop were due to his rear tire blowing out. The motorcycle's front tire also was flat, but Alfred did not feel it happen and did not know what caused it.

Alfred's friend testified the accident happened as Alfred drove onto the overpass. Alfred appeared to hit "a speed bump[,]" causing the rear of "his bike [to] go[] up in the air and com[e] down and los[e] control." The friend also heard a popping sound. Like Alfred, he did not see a pothole or debris on the road, only the "transition from black pavement to concrete," as they approached the overpass. He was unsure what Alfred hit.

The State Trooper who responded to the accident also testified at deposition. He did not recall seeing any defect, including uneven elevation, on the roadway.

Less than a month after the accident, Alfred visited the scene and made a video. He testified he did not see anything and still did not know what happened. However, at his second deposition, he identified an "expansion joint in the

5

bridge" as the object he thought he had struck and "assume[d] that's what caused the accident."

In 2014, NJTA commenced a road-widening project, which included the overpass where Alfred's accident took place. The project aimed to widen the interchange between mileposts thirty-eight and forty-one, by installing a third lane on the Parkway and extending the bridge abutments. Later, the plan was modified to replace the entire overpass.

In September 2014, NJTA contracted with Midlantic to perform the construction work on the project. On October 1, 2014, NJTA contracted with Jacobs to supervise the construction for the project. Jacobs subcontracted with Urban to oversee construction inspection on the project on October 8, 2014.

The parties do not dispute construction began before the accident. The record does not indicate whether there was construction on the portion of the roadway where the accident occurred. However, plaintiffs' theory of liability is the alleged roadway defect existed before the construction and defendants had a responsibility to maintain and inspect the roadway for defects, including pre-existing conditions.

According to Midlantic's project manager, NJTA was responsible for the safety of its roadway. However, two NJTA construction officials, as well as

6

Jacobs's and Urban's engineers, all agreed that once the construction began, Midlantic was responsible for inspecting the roadway. Regardless of who was responsible, all defendants agreed that their own workers could not overlook any defects they observed in the roadway. The chief inspector for Jacobs, stated that while working on the project, he conducted periodic inspections of the roadway and that a daily inspector from Urban also reviewed the roadway. Midlantic's representative said he was not familiar with any contractual obligation that would require Midlantic employees to identify defects on the roadway, but if he observed a defect, he would have notified NJTA.

On April 22, 2015, an engineering company issued a routine biennial bridge inspection report to NJTA, regarding the overpass over Route 30. The report noted "[s]ettlement at the southbound north abutment joint up to [two inches,]" describing the roadway condition as "[r]amped up and deteriorated in the left shoulder and left lane" and included a photograph of the condition. The report made maintenance and repair recommendations, including to repair the "joints at abutments and pier." It also described the north abutment's condition as "fair" but did not check off this area as requiring repair.

On June 22, 2015, while working on the roadway and after removing the existing parapet on the overpass, an Urban official emailed NJTA and Jacobs

representatives questioning the condition of the entire bridge deck and recommending an in-field visit or testing to assess its condition. This led to a field inspection by engineers on June 24, 2015, to assess the deck condition and determine whether it required removal. The resulting inspection report described the deck condition and identified "significant settlement" on the roadway at the north approach, which was clarified on July 7, 2015, to explain that it was the south approach and that this was not the basis for recommending replacement of the deck. The inspection report led to a change of plans for the project, namely, to replace the entire overpass deck, as opposed to only widening the structure. NJTA approved the change of plan on August 16, 2015. Alfred's accident on September 12, 2015, occurred during a time when the project remained ongoing. The parties stipulated the accident occurred within the perimeter of the project.

Approximately two months after the accident, a separate change order was prepared to add "temporary pavement at longitudinal construction joint . . . to accommodate [the] difference in elevation between the proposed and existing bridge sections." Urban said this was for emergency repairs to prepare the roadway for the winter plowing season. At his deposition, Urban's representative explained that any repair to the left lane where the accident

occurred was only "if time permitted." Pursuant to the change order, certain portions of the roadway were repaved, including where the accident occurred.

Urban's representative testified he did not recall seeing any defect or settlement in the southbound left lane while working on the project. Representatives for Jacobs, Urban, and Midlantic neither recalled observing nor being informed of any issue on the roadway. An NJTA representative said he could see "some difference in settlement" in a photograph of the roadway but could not "determine one way or the other" if there was an actual change in the elevation of the roadway.

Plaintiffs' expert testified regarding the condition of the roadway and causation at deposition and in the N.J.R.E. 104 hearing. He did not inspect the accident site in person, partly because the roadway had been repaired after he was retained. The expert based his evaluation of the roadway on the biennial bridge inspection report; plaintiffs' and other witnesses' description of the accident; Alfred's video recording of the roadway and a still taken from that recording; and the June 2015 inspection report.

The expert opined there was significant settlement at the barrier curb on the roadway approaching the bridge deck, resulting in a two-inch elevation "between the surface pavement at the southern deck approach joint at the north

A-2866-22

abutment." He opined this "abrupt change[ of] elevation" and a hole in the roadway constituted a dangerous condition. The expert did not measure the elevation change, but concluded the two-inch measurement was consistent with his review of the photographs.

The expert could not determine whether the settlement measured two inches across the entire width of the elevation change. He testified it was difficult to see any settlement from the photographs attached to the field inspection report, but claimed it was most visible on the roadway surface near the barrier curb. He noted the concrete barrier was uneven, and the yellow edge line on the road next to the barrier curb went "quickly uphill" in the same area. However, he could not identify this area as where the accident occurred. Nonetheless, because "the conditions at that location were dangerous" and could have caused Alfred's accident, he concluded "in all likelihood and to a likely degree of engineering certainty that [it] was the cause of the incident."

The expert described the elevation change in varying ways during his depositions. At first, he said the change was immediate and abrupt, without any taper (a gradual sloping between the roadway and the area of elevation), but with the benefit of a better photograph from the June 2015 inspection, conceded he did not see an "obvious abrupt edge" in the elevation change. Regardless, he

10

testified even if there was a taper, it would not change his opinion that the roadway presented as a dangerous condition, because any change in elevation was dangerous, and any purported use of tapering was insufficient. The expert cited the New Jersey Department of Transportation, which requires a taper of twenty inches for every one inch of elevation change, and opined the two-inch elevation change here would have required a forty-inch taper to alleviate the dangerous condition, which did not exist.

Although the expert agreed the June 2015 field inspection report listed the roadway condition as "fair[,]" the report did not indicate that it required emergency repair and did not include this area in its list of repair recommendations. The purpose of the report was to address the bridge's structural issues. He noted the settlement issue was important because it was identified in the report.

The expert's view was reinforced by the fact there was significant settlement on the pavement at the north approach. Although a subsequent email corrected the fact the settlement was at the south approach, the expert claimed the email presented a contradiction. Even if there was settlement only at the south abutment, it nevertheless placed defendants on notice that "something[ is] going on," warranting further attention.

A-2866-22

Plaintiffs' expert claimed a video Alfred had taken one month after the accident was dispositive because it showed a truck driving over the area of the accident and experiencing "a substantial jolt" when it traversed the deck approach. He attributed the truck's up and down movement as evidence of its "reaction to going over that dangerous condition." The expert acknowledged he did not know any details about the truck's condition, including the status of its shock absorbers and suspension, and could not state with certainty whether the jolt was caused by the same roadway defect Alfred had encountered.

The expert did not perform an accident reconstruction or inspect Alfred's motorcycle. He made no calculations of the: motorcycle's speed and weight; level of force that would result from a two-inch elevation change; or distance between the elevation change and where Alfred's motorcycle came to a stop. He did not investigate other causes for the accident, was unaware Alfred had a flat tire following the accident, and had no opinion about what caused the flat. The expert explained these were considerations for an accident constructionist, and his role was to assess the condition of the roadway.

The expert concluded each defendant had an independent contractual obligation for the maintenance and protection of traffic, and were responsible for maintaining the safety of the roadway. NJTA had a general duty and

12

responsibility for the maintenance and protection of traffic. Midlantic assumed this responsibility when it took on the role of general contractor on the project. Midlantic's contract required it to assign a traffic control coordinator to conduct daily inspections of the roadway and oversee various aspects of traffic control, including maintaining signs and lights. The coordinator also had to ensure "all excavations or drop-offs greater than two inches deep are protected in accordance with the [Manual on Uniform Traffic Control Devices (MUTCD)]."

According to the expert, Jacobs had to conduct or attend pre-construction meetings and inspect all construction activities and had to ensure Midlantic adhered to the maintenance and protection of traffic. Jacobs's contract did not specify the maintenance and protection of traffic obligations. However, the expert nonetheless concluded if Midlantic had to adhere to the MUTCD, Jacobs also was required to do so. Moreover, a section in Jacob's contract with NJTA entitled "professional standard of care" required it to "exercise that degree of care and skill ordinarily exercised under similar circumstances by members of its profession performing the kind of services hereunder." Urban was also responsible for the project and to ensure that the contractors completed the work in accordance with the plans and specifications, including maintaining safety of the work zone.

Plaintiffs' expert concluded each defendant had a responsibility and duty for maintenance and protection of traffic, in accordance with the MUTCD. The MUTCD required the use of warning signs when necessary, including for a "sharp rise or depression" in the roadway. Due to the elevation change, defendants had to either install warning signs cautioning drivers of the elevation change, or temporarily repair the roadway.

The expert concluded all defendants knew, or should have known, of the roadway's dangerous condition based on the June 2015 field inspection report, which placed them on notice the roadway required further attention. He also opined defendants likely had inspected the roadway both prior to bidding on the project and commencing construction. Therefore, defendants' failure to identify and warn drivers of this defect was a violation of their duties and responsibilities under the contract, and caused Alfred's accident.

## II.

Urban moved for summary judgment, arguing plaintiffs' fourth amended complaint, which was amended to include Urban, violated the statute of limitations. On September 27, 2019, the first motion judge denied the motion because he found plaintiffs had preserved their claims against Urban pursuant to Rule 4:26-4.

14

Defendants then separately moved for summary judgment. They disclaimed liability, arguing: they were not responsible for any pre-existing defects in the roadway; plaintiffs failed to sufficiently plead a cause of action for negligence; and plaintiffs' expert failed to establish causation and instead offered an inadmissible net opinion.

The parties appeared before a second motion judge, who concluded he could not decide the summary judgment motions without first conducting a N.J.R.E. 104 hearing on the admissibility of plaintiffs' expert opinion. A third motion judge subsequently conducted the N.J.R.E. 104 hearing and adjudicated the summary judgment motions.

On April 10, 2023, the judge granted defendants' motions for summary judgment. On June 14, 2023, he entered an amended order granting summary judgment and dismissed the complaint with prejudice. The judge made detailed written findings.

Plaintiffs argued the TCA did not apply because road maintenance is a ministerial task, which did not afford NJTA immunity. The judge rejected the argument, citing a litany of reported cases from our Supreme Court and us applying the TCA where plaintiffs alleged negligence based on the conditions of roadways and roadway maintenance. He found NJTA was entitled to

summary judgment because plaintiffs failed to set forth a cause of action for negligence under the TCA.

The judge concluded there was "not sufficient evidence for any reasonable trier of fact to conclude[] that there was a dangerous condition." Although plaintiffs' theory of the case was the alleged two-inch decline in the roadway, the judge noted the elevation change was confined to a small area, and neither Alfred, the eyewitnesses, the trooper who responded, nor the contractors working on the site could identify the dangerous condition. Roadway imperfections were not uncommon and there was no evidence the imperfection in this case was a dangerous condition. Although plaintiffs' expert relied on the June 2015 field inspection reports identifying the condition, he ignored the fact the reports did not indicate there was a dangerous condition that required immediate attention. Photos of the site did not reveal a dangerous condition. Although a dangerous condition could be inferred, the judge found the record contained "no such evidence upon which to base a reasonable inference."

The judge rejected plaintiffs' argument the repairs made to the road were evidence of the dangerous condition. The repairs were made to assist snowplows, not because of the accident. Plaintiffs' expert conceded the repair work orders were not for purposes of remedying a dangerous condition and that

fixing the roadway for the snowplows was a legitimate reason to make the repairs. Regardless, the judge found subsequent remedial measures were not a basis to find liability pursuant to N.J.R.E. 407. As the repairs were not due to the accident, they were irrelevant to liability pursuant to N.J.R.E. 403 as well.

The motion judge also rejected plaintiffs' expert opinion that the June 2015 field report gave NJTA actual notice of the dangerous condition. The report was issued for repair and maintenance purposes, not to address a dangerous condition requiring immediate attention. "There [was] no evidence to indicate . . . NJTA had actual notice of the alleged dangerous condition . . . ." The judge also concluded the failure to remedy the alleged defect was not palpably unreasonable because NJTA was responsible for an extensive roadway network, there were no previous complaints or accidents in that area, and no employees had observed any defects requiring repair.

The motion judge next turned to the defendants' respective motions for summary judgment based on the inadmissibility of plaintiffs' expert opinion as a net opinion. He found NJTA had the continuing duty to inspect, maintain, and repair its roads, and had not transferred the obligations to the other defendants. Not only did the contracts establish this fact, but "[w]ell after the contracts were awarded, and well after the work on the projects had begun, NJTA took steps

17

that clearly indicate[d] it retained the obligation to inspect, maintain[,] and repair the roadway." NJTA arranged for a bridge inspection when it commissioned the June 2015 field inspection report. None of the other defendants were involved in this process.

Plaintiffs' expert opined all defendants had the duty to inspect, maintain, and repair the project area from the time they signed their contracts to completion of the project. Midlantic's contract with NJTA contained a provision that the project included "maintenance and protection of traffic . . . ." The expert opined this language meant Midlantic was responsible for the maintenance and protection of traffic over the entire project when it signed the contract.

The motion judge ruled the word "maintenance" could not be read in isolation. "Read properly, it means maintenance of traffic and protection of traffic. It does not mean maintenance of the entire project area . . . it clearly means that, during construction, the contractor must be sure that traffic can continue to flow through the construction site . . . safely . . . ." The judge noted "'maintenance and protection of traffic' ha[d] to be read in context. The entire paragraph [that contained this phrase] describes the scope and intent of the project, ending with other miscellaneous work necessary[,] and incidental to the

A-2866-22

completion of the [p]roject." There was no language in the contract transferring "all responsibility for the roadway . . . to Midlantic."

The contract Jacobs signed contained no "'maintenance and protection of traffic,' nor anything regarding the [MUTCD]." Jacobs contracted with Urban to have the latter serve as the resident engineer and chief inspector of the project. The judge found "[w]hile the contract lists [twenty-three] specific obligations, none of the specific obligations is to identify pre-existing roadway defects. The focus of the [twenty-three] specific obligations is on the coordination and procedural requirements inherent to the construction activities associated with the road-widening project . . . ."

Beyond the contracts, plaintiffs' expert opined defendants were responsible for inspection and maintenance from the moment they signed their contracts. Midlantic's chief inspector testified he would inspect the roadway surface for potholes and elevation changes. Urban's resident engineer likewise testified "[s]afety is an overall . . . responsibility of the contractor" and that included inspecting the roadway for elevation issues and settlement. The motion judge concluded plaintiffs' expert opinion was "supported by his experience[] and is largely confirmed by representatives from Midlantic and Urban" and therefore was not a net opinion.

However, plaintiffs' expert never established "a standard of care with regard to the duty to inspect" or how a "daily inspection" should be performed. The expert "never state[d] what [d]efendants should have done during a daily inspection that would have cause[d] [them] to identify the condition at the bridge joint." Plaintiffs' expert merely opined the condition would have been identified if a daily inspection had been conducted. The judge concluded this was a net opinion and because the expert could not identify a standard of care his opinion would be barred.

Plaintiffs' expert also changed his opinion regarding the alleged dangerous condition, which the motion judge found problematic. At first, he opined the accident occurred because plaintiff struck a hole. Then he said the cause of the accident was an immediate change in the elevation of the roadway without any taper. When the expert later conceded at deposition that the photos of the crash site did not show an abrupt two-inch change in elevation and showed there was a taper, he changed his opinion, and opined the defect was inadequate taper. The judge found the expert's testimony at the N.J.R.E. 104 hearing, "scramble[d] all these theories together and described the defect as an elevation change."

The judge characterized the change in the expert's theory of defect and causation as "substantial" because "[a] hole is different than an abrupt elevation

change, and an abrupt elevation change is different than inadequate tapering. Each is a different theory of liability."  Because the expert repeatedly changed his opinion when the facts did not support his prior opinion, the judge concluded his opinion was unreliable and therefore inadmissible.  The lack of reliability was compounded by the fact the expert never inspected the roadway, or measured the depth of the alleged hole, the elevation change, or the tapering. He could not identify the alleged defect when he was shown a photo of the crash site, and said "it[ is] just my opinion" and that he "assume[d the condition] is dangerous."

The judge concluded there were no facts to support the expert's opinion. "An assumption is not an opinion to a reasonable degree of engineering probability."

Based on the June 2015 field inspection report, plaintiffs' expert opined there was a hole approximately two inches deep.  However, the judge noted the report said there was a hole up to two inches deep, the bridge was in satisfactory condition, and the approach was fair.  "There [was] nothing in the [field inspection] report that would allow anyone to conclude . . . there was a defect in the road so severe or so dangerous that immediate action was required."

A-2866-22

The expert also opined there was an uneven roadway because he saw a vehicle jolt in the video Alfred made. However, he conceded he did not know whether the condition that caused the truck to jolt also caused Alfred's accident. The judge concluded "[t]he video is simply not reliable evidence upon which an expert could base an opinion." There were no other prior accidents at this location, or complaints made about the roadway.

The motion judge found the expert's reasoning was "flawed and unreliable" because he "assume[d] there was not any operator negligence or motorcycle defect that caused the accident; therefore, there must be a defect in the roadway that caused the accident." The judge concluded this sort of logic was a net opinion and a jury hearing the evidence would have to speculate on causation, just like plaintiffs' expert.

## III.

Our review of a ruling on summary judgment is de novo, applying the same legal standard as the trial court. Townsend v. Pierre, 221 N.J. 36, 59 (2015). We "review the competent evidential materials submitted by the parties to identify whether there are genuine issues of material fact and, if not, whether the moving party is entitled to summary judgment as a matter of law." Bhagat

v. Bhagat, 217 N.J. 22, 38 (2014) (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995)); R. 4:46-2(c).

We apply an abuse of discretion standard in review of a trial court's decision to admit expert testimony. In re Accutane Litig., 234 N.J. 340, 348 (2018). Under this standard, a trial court's ruling will be reversed "only if it 'was so wide off the mark that a manifest denial of justice resulted.'" Rodriguez v. Wal-Mart Stores, Inc., 237 N.J. 36, 57 (2019) (quoting Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016)).

"When, as in this case, a trial court is 'confronted with an evidence determination precedent to ruling on a summary judgment motion,' it 'squarely must address the evidence decision first.'" Townsend, 221 N.J. at 53 (quoting Est. of Hanges v. Metro. Prop. & Cas. Ins., 202 N.J. 369, 384-85 (2010)). Therefore, we must review the trial court's decisions "in the same sequence, with the evidentiary issue resolved first, followed by the summary judgment determination of the trial court." Ibid. (quoting Hanges, 202 N.J. at 385).

## IV.

On appeal, plaintiffs challenge summary judgment in favor of NJTA on the basis that plaintiffs failed to allege a sufficient claim under the TCA. They argue the TCA was inapplicable because their claim was rooted in the fact that

roadway maintenance is a ministerial act for NJTA. Plaintiffs assert whether NJTA's conduct was ministerial or discretionary was a jury issue. They also contest the motion judge's findings on the issues of a dangerous condition, causation, notice, and whether NJTA's actions were palpably unreasonable.

Plaintiffs challenge the granting of summary judgment to all defendants based on the exclusion of plaintiffs' expert opinion. They contend: there was a factual and scientific basis for the expert's opinion; the judge made improper credibility determinations and did not construe the facts in plaintiffs' favor; the expert did not change his theory of the case; the judge improperly excluded the expert's opinion because he was not an accident reconstructionist; and the judge did not have to determine the standard of care because defendants had notice of the roadway defect and regardless, the expert demonstrated the applicable standard of care based on the parties' contracts, the MUTCD, and his years of experience.

Plaintiffs also contest the summary judgment ruling on grounds the motion judge did not conduct oral argument. They point out the parties each requested oral argument.

A.

Net Opinion

"The net opinion rule is a 'corollary of [N.J.R.E. 703] . . . which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data.'"  Townsend, 221 N.J. at 53-54 (alterations in original) (citing Polzo v. Cnty. of Essex, 196 N.J. 569, 583 (2008) ("Polzo I")). An opinion that is "circular[,]" or contains "bare conclusions, unsupported by factual evidence, is inadmissible."  Buckelew v. Grossbard, 87 N.J. 512, 524 (1981).  Experts must "give the why and wherefore that supports the opinion, rather than a mere conclusion" and must "be able to identify the factual bases for their conclusions" and "explain their methodology."  Townsend, 221 N.J. at 54-55 (first quoting Borough of Saddle River v. 66 E. Allendale, LLC, 216 N.J. 115, 144 (2013); and then quoting Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992)).  The failure to prove a causal connection between the injury and the alleged error can render an expert's opinion a net opinion.  Eckert v. Rumsey Park Assocs., 294 N.J. Super. 46, 51 (App. Div. 1996) (citing Buckelew, 87 N.J. at 524).  At its core, "[t]he net opinion rule is a 'prohibition against speculative testimony.'"  Ehrlich v. Sorokin, 451 N.J. Super. 119, 134 (App. Div. 2017) (quoting Harte v. Hand, 433 N.J. Super. 457, 465 (App. Div. 2013)).

At the outset, we reject plaintiffs' argument the motion judge erred because he did not weigh the evidence in their favor. The judge did not decide the case based on the motion submissions alone but conducted an N.J.R.E. 104 hearing. This enabled him to weigh the evidence before deciding whether the expert's opinion should be excluded. For these reasons, we also reject plaintiffs' assertion the judge erred by considering credibility. Although the judge did not expressly make a credibility finding, he did find that plaintiffs' expert opinion was unsupported and ruled it inadmissible. The judge could make such a finding because he held a testimonial hearing.

Substantively, the motion judge's ruling that plaintiffs' expert offered a net opinion was sound. The expert failed to establish causation. Although he identified an alleged defect in the roadway, he did not know whether Alfred drove over it and failed to measure or test whether the alleged defect caused the accident. Rather, the expert concluded that because there was a defect in the roadway and Alfred suffered an accident near that defect, his accident must have been caused by this defect. This was insufficient to establish causation and would only cause a jury to speculate.

Contrary to plaintiffs' assertions, the motion judge did not bar their expert because he was not a reconstruction expert. "An expert's proposed testimony

should not be excluded merely 'because it fails to account for some particular condition or fact which the adversary considers relevant.'" Townsend, 221 N.J. at 54 (quoting Creanga v. Jardal, 185 N.J. 345, 360 (2005)). However, the expert must "otherwise offer[] sufficient reasons which logically support [their] opinion." Ibid. (quoting Rosenberg v. Tavorath, 352 N.J. Super. 385, 402 (App. Div. 2002)).

Plaintiffs' expert opined a two-inch abrupt change in elevation caused the accident, without determining whether this defect could have caused Alfred to get a flat tire or lose control of his motorcycle, resulting in his accident. The motion judge's remark that the expert failed to reconstruct the accident was due to the fact there was no objective evidence to support his theory of causation. Indeed, the expert testified a reconstructionist could address whether this defect could have caused this type of accident. The expert failed to establish the "wherefores" necessary to avoid a net opinion.

We part ways with the motion judge's finding the expert failed to establish a dangerous condition because his view of what the dangerous condition was changed during the case. The judge based this finding on Stewart v. New Jersey Turnpike Authority/Garden State Parkway, which involved a motorcycle crash on the Garden State Parkway, where the plaintiffs initially alleged they lost

control of their motorcycle when they struck a piece of metal in the bridge's expansion joint that jutted out of the roadway. 249 N.J. 642, 647 (2022). Then, after more than two years of discovery, during oral argument on the defendants' summary judgment motion, the plaintiffs argued for the first time that a height differential on the roadway, due to improper paving, caused the accident. Id. at 648.

Our Supreme Court affirmed the trial court's summary judgment ruling based on this change in theory. Id. at 657. This was because the plaintiffs never previously mentioned a defect in the pavement, and the defendants were prejudiced because they could not have reasonably anticipated this change in theory "at the eleventh hour . . . ." Id. at 658. The Court explained its holding did not prohibit parties from "revis[ing] their theories throughout the litigation process," but that "a change in theory as fundamental and belated as the one here cannot be countenanced." Ibid.

Plaintiffs' fourth amended complaint attributed Alfred's accident to a "defect in the roadway which caused the rear tire of his motorcycle to blow out and caused him to crash into the concrete barrier." It did not specifically define the defect as either a hole or elevation.

The expert's December 3, 2020 report described the defect on the roadway as both a hole and settlement, without clarifying this discrepancy. Then, during his depositions, he did not attribute the accident to a pothole, but as a change in the roadway's elevation. At the expert's first deposition, he described the elevation change as abrupt or immediate. However, during his second deposition, he acknowledged the elevation change appeared to have some tapering, but then later described this change as immediate.

We conclude the expert's opinion was consistent to the extent he opined the change in the roadway, with or without tapering, presented a dangerous condition, due to defendants' failure to repair the roadway, install a temporary ramp, or use appropriate signage to warn of elevation change. The facts here are different than Stewart because the changes in the expert's theory were not fundamental. He always attributed the accident to a defect in the roadway. His testimony that a hole and then an elevation change was the dangerous condition happened at his depositions, which were taken in October and November 2021, approximately six months before the N.J.R.E. 104 hearing, and prior to defendants filing their summary judgment motions. Although the changed testimony was problematic in terms of credibility and the net opinion issue, it

was not the sort of "eleventh hour" change disapproved of by the court in Stewart.

Regardless, the expert's opinion on the dangerous condition was properly excluded as a net opinion. N.J.S.A. 59:4-1 defines a dangerous condition as a condition that "creates a substantial risk of injury when such property is used with due care in a manner in which it is reasonably foreseeable that it will be used." In Polzo v. County of Essex, 209 N.J. 51, 65 (2012) ("Polzo II"), the Court stated: "Potholes and depressions are a common feature of our roadways," but "not every defect in a highway, even if caused by negligent maintenance, is actionable." (quoting Polyard v. Terry, 160 N.J. Super. 497, 508 (App. Div. 1978)).

The expert failed to show there was a dangerous condition because the evidence he relied upon did not support his opinion. He primarily relied on the field study report, which: did not conclude the settlement on the roadway was dangerous; described the roadway condition as "fair;" and did not include removal of the settlement as a task that required immediate repair. The expert also never inspected the roadway or made any attempt to measure the defect in person or through the photographs in evidence. For these reasons, the expert's reliance on the MUTCD was irrelevant. The manual required the use of warning

A-2866-22

signs for a "sharp rise or depression" in the roadway; it did not define what qualified as such a sharp rise or depression. Thus, the expert could not testify with specificity about the nature of the roadway defect and whether it violated any MUTCD standard.[2]

The expert's opinion was also properly barred because it failed to establish the standard of care. Whether a party owes a legal duty, as well as the scope of the duty owed, are questions of law for the court to decide. Carvalho v. Toll Bros. & Devs., 143 N.J. 565, 572 (1996). Depending on the dispute at issue, expert testimony may be required to demonstrate "the requisite standard of care" and whether defendants deviated from that standard. Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 407 (2014). The motion judge properly found plaintiffs' expert could testify defendants had a duty to inspect, maintain, and repair the roadway, but had failed to establish the standard of care they had to follow in performance of this duty.

We reject plaintiffs' assertion that because the expert demonstrated defendants had notice of the defect, the standard of care was irrelevant. The standard of care concerns whether defendants were required to identify and

---

[2] The expert also failed to show the elevation change created a substantial risk of injury as required by N.J.S.A. 59:4-1.

report any defects.  Id. at 413.  Although the expert opined defendants had to engage in daily inspections, the court correctly concluded he did not address how these inspections must be conducted and how any defects should be reported.

Plaintiffs relied upon "NJTA's Specifications for Bridge and Road Construction[,]" which stated that "all excavations or drop-offs greater than [two] inches deep are protected in accordance with the [MUTCD]."  This language was also in Midlantic's contract.  However, plaintiffs' expert conceded this provision did not strictly apply here, in part because the field inspection report described the elevation as "up to two inches[,]" falling shy of the MUTCD's "greater than [two] inches" requirement.  As we noted, while the MUTCD requires signage for sharp changes in elevation, it does not define what levels of elevation changes require such signage.  Plaintiffs' expert failed to demonstrate a standard of care for elevation changes measuring two inches or less.

Plaintiffs' claim expert testimony was not necessary to determine the standard of care, because defendants' responsibility could be established using common knowledge lacks merit. The common knowledge exception applies in limited situations where a person of reasonable intelligence could use their

common knowledge to determine that there was a deviation from a standard of care. Cowley v. Virtua Health Sys., 242 N.J. 1, 9 (2020). In such cases, "[i]t is sufficient for [the] plaintiff to show what the defendant did and what the circumstances were[,]" with the jury determining the standard of conduct, meaning "what precautions a reasonably prudent [person] in the position of the defendant would have taken." Davis, 219 N.J. at 407 (first and second alteration in original) (quoting Sanzari v. Rosenfield, 34 N.J. 128, 134 (1961)).

There is no way a jury could have assessed the condition of the roadway, evaluated the parties' contracts, and the applicable manuals to determine there was a hazard and what defendants should have done about it. Non-net opinion expert testimony was essential to explain the standard of care to the jury.

B.

NJTA and the TCA

Plaintiffs asserting a cause of action for negligence must demonstrate a duty of care, breach of the duty, actual and proximate causation, and damages. Davis, 219 N.J. at 406 (citing Jersey Cent. Power & Light Co. v. Melcar Util. Co., 212 N.J. 576, 594 (2013)). "Negligence is a fact which must be shown and which will not be presumed." Franco v. Farleigh Dickinson Univ., 467 N.J. Super. 8, 25 (App. Div. 2021) (quoting Long v. Landy, 35 N.J. 44, 54 (1961)).

"The mere showing of an incident . . . is not alone sufficient to authorize the finding of an incident of negligence."  Ibid. (alteration in original) (quoting Long, 35 N.J. at 54).  Plaintiffs must demonstrate negligence "by some competent proof[,]" and the failure to do so warrants dismissal.  Townsend, 221 N.J. at 51, 67 (quoting Davis, 219 N.J. at 406).

Notwithstanding these general principles, our Legislature has declared "that public entities could only be held liable for negligence 'within the limitations of [the TCA].'"  Stewart, 249 N.J. at 655 (alteration in original) (quoting N.J.S.A. 59:1-2).  "By establishing this public policy, the Legislature recognized that 'government should not have the duty to do everything that might be done.'"  Henebema v. S. Jersey Transp. Auth., 430 N.J. Super. 485, 501 (App. Div. 2013) (quoting N.J.S.A. 59:1-2).  Thus, under the TCA, immunity is "the general rule . . . and liability is the exception."  Ibid. (quoting Coyne v. Dep't of Transp., 182 N.J. 481, 488 (2005)).  "[T]he burden is on the public entity both to plead and prove its immunity . . . ."  Ibid. (first alteration in original) (quoting Kolitch v. Lindedahl, 100 N.J. 485, 497 (1985)).

Under the TCA:

> A public entity is liable for injury caused by a condition of its property if the plaintiff establishes that the property was in dangerous condition at the time of the injury, that the injury was proximately caused by the

dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:

a. a negligent or wrongful act or omission of an employee of the public entity within the scope of [their] employment created the dangerous condition; or

b. a public entity had actual or constructive notice of the dangerous condition under section 59:4-3 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.

Nothing in this section shall be construed to impose liability upon a public entity for a dangerous condition of its public property if the action the entity took to protect against the condition or the failure to take such action was not palpably unreasonable.

[N.J.S.A. 59:4-2.]

"These elements are 'accretive; if one or more of the elements is not satisfied, a plaintiff's claim against a public entity alleging that such entity is liable due to the condition of public property must fail.'" Stewart, 249 N.J. at 656 (quoting Polzo I, 196 N.J. at 585).

N.J.S.A. 59:2-3 and 59:3-2 immunize public entities and public employees for the exercise of discretion within the scope of employment. "The standard for liability under the TCA depends on whether the conduct of individuals acting on behalf of the public entity was ministerial or discretionary." Est. of Gonzalez

v. City of Jersey City, 247 N.J. 551, 571 (2021) (quoting Henebema, 219 N.J. at 490). "When a public entity's or employee's actions are discretionary, liability is imposed only for 'palpably unreasonable conduct.'" Ibid. (quoting Henebema, 219 N.J. at 495). In contrast, liability for ministerial actions "is evaluated based on an ordinary negligence standard." Ibid. (quoting Henebema, 219 N.J. at 490).

In Gonzalez, our Supreme Court recognized that "[a]lmost all official conduct, no matter how ministerial, involves the exercise of some judgment and decision[-]making." Ibid. (first alteration in original) (quoting Costa v. Josey, 83 N.J. 49, 60 (1980)). Discretionary acts include "actual, high-level policymaking decisions involving the balancing of competing considerations." Ibid. (quoting Coyne, 182 N.J. at 489). Ministerial acts are those "which a person performs in a given state of facts in a prescribed manner in obedience to the mandate of legal authority, without regard to or the exercise of his own judgment upon the propriety of the act being done." Id. at 571-72 (quoting S.P. v. Newark Police Dep't, 428 N.J. Super. 210, 231 (App. Div. 2012)). An action is ministerial even if it "entail[s] '[o]perational judgments,' such as 'when, where and how' to carry out a required duty." Id. at 572 (second alteration in original) (quoting Ojinnaka v. City of Newark, 420 N.J. Super. 22, 37 (Law Div. 2010); Morey v. Palmer, 232 N.J. Super. 144, 149 (App. Div. 1989)). A dispute about

whether a public entity's conduct "was discretionary or ministerial conduct . . . requires submission to the jury." T.B. v. Novia, 472 N.J. Super. 80, 97 (App. Div. 2022) (omission in original) (quoting Henebema, 430 N.J. Super. at 506).

In Costa, our Supreme Court characterized discretionary determinations as those including decisions on whether to use NJTA resources to maintain a road, repair it, and determine what roads require such repair. 83 N.J. at 55. Once that decision is made, the act of repairing the road constitutes a ministerial act. Id. at 55, 59-60; see also Coyne, 182 N.J. at 489 (determining that road cleaning operation was a ministerial action).

As the motion judge noted, our courts repeatedly have applied the TCA to general roadway maintenance cases involving accidents related to an existing defect on the roadway that the operator failed to repair. See, e.g., Stewart, 249 N.J. at 655 (motorcycle accident caused by roadway conditions); Polzo I, 196 N.J. at 578, 585 (bicyclist was injured after riding over a depression or declivity in the roadway); Atalese v. Long Beach Twp., 365 N.J. Super. 1, 4 (App. Div. 2003) (pedestrian fell on uneven portion of the street); Furey v. Cnty. of Ocean, 273 N.J. Super. 300, 309 (App. Div. 1994) (accident involving drop-off on the roadway); and Polyard, 160 N.J. Super. at 504-05 (car accident involving declivity on roadway).

Notwithstanding these cases, it is also true, as plaintiffs argue, that our courts have characterized roadway maintenance as ministerial.  See, e.g., Coyne, 182 N.J. at 489 (road cleaning operation was a ministerial action); Costa, 83 N.J. at 55, 59-60 (while decision to repair median was discretionary, the repair work itself was ministerial); Schriger v. Abraham, 83 N.J. 46 (1980) (remanding pursuant to the holding in Costa, 83 N.J. at 49, to determine whether immunity extended to repair work and constituted improper maintenance of the road where the repair to the median deviated from the original plans and potentially increased the hazardous condition); Brown v. Brown, 86 N.J. 565, 577-78 (1981) (assessing whether TCA immunity was applicable under N.J.S.A. 59:2-3(d) because the State acknowledged there was a dangerous condition that it had failed to remedy, thereby making its conduct palpably unreasonable); Furey, 273 N.J. Super. at 309 (applying TCA to roadway maintenance case).

Pursuant to these principles, we discern no error in the motion judge's decision to apply the TCA to plaintiffs' claim against NJTA.  The facts here did not involve how NJTA repaired the roadway because the facts did not support the conclusion there was a dangerous condition at the accident site, which required remediation.  NJTA's actions involved maintenance of the roadway for the duration of the project and constituted a discretionary act; it never undertook

38

to repair the surface area to trigger its ministerial functions, thereby taking its conduct outside of the TCA. Since the facts did not support a credible dispute about whether NJTA was acting on a discretionary basis or ministerially, the matter did not need to be submitted to a jury.

Substantively, summary judgment in NJTA's favor on plaintiffs' TCA claim was warranted. N.J.S.A. 59:4-1(a) defines a "dangerous condition" as "a condition of property that creates a substantial risk of injury when such property is used with due care in a manner in which it is reasonably foreseeable that it will be used." "A 'substantial risk' is 'one that is not minor, trivial or insignificant." Est. of Massi v. Barr, 479 N.J. Super. 144, 157 (App. Div. 2024) (quoting Kolitch, 100 N.J. at 493).

"[N]ot every defect in a highway, even if caused by negligent maintenance, is actionable." Polyard, 160 N.J. Super. at 508 (citing N.J.S.A. 59:4-1). "Travelers on highways must expect some declivities and some areas of imperfect surfaces." Id. at 509.

"Whether a dangerous condition exists is ultimately a question for the jury." Posey v. Bordentown Sewerage Auth., 171 N.J. 172, 188 (2002). "Even so, 'like any other fact question before a jury, [that determination] is subject to the court's assessment whether it can reasonably be made under the evidence

presented.'" Massi, 479 N.J. Super. at 158 (alteration in original) (quoting Black v. Borough of Atl. Highlands, 263 N.J. Super. 445, 452 (App. Div. 1993)) (alteration in original).  In the context of a summary judgment motion, the court "must examine the issue 'pragmatically' to determine whether the particular irregularities complained of 'were such that reasonable minds could differ as to whether they manifested that the [roadway] was in a dangerous condition.'" Ibid. (alteration in original) (quoting Polyard, 160 N.J. Super. at 510).

Applying these principles, the motion judge correctly found there was insufficient evidence from which a reasonable trier of fact could conclude the alleged defect in the roadway qualified as a dangerous condition.  In Polzo II, 209 N.J. at 74, the Court held the plaintiff's expert's failed to demonstrate—through either tests or any recognized standard—that "a one-and-one-half inch depression on the shoulder of a road" created a substantial risk of injury under N.J.S.A. 59:4-1.  In Furey, 273 N.J. Super. at 306, 311, we concluded a jury could reasonably find that the failure to repair a drop-off in the roadway, which ranged between two and six inches, created a substantial risk of injury.  There, county employees testified it was their responsibility to repair these types of drop offs, and a police officer said that the drop off caused the plaintiff's accident.  Ibid.

This case is akin to Polzo II, because the evidence in the record is insufficient to permit a rational factfinder to conclude the alleged defect was a dangerous condition. Plaintiffs had no evidence to permit a jury to conclude an elevation of two inches or less could result in significant injury. And without "any recognized or established standard" directly addressing the hazards of an elevation change of two inches or less, plaintiffs could not meet their prima facie burden of showing a dangerous condition. Polzo II, 209 N.J. at 74.[3]

To prove causation, plaintiffs "bear the burden to 'introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result.'" Townsend, 221 N.J. at 60-61 (quoting Davidson v. Slater, 189 N.J. 166, 185 (2007)). While "[t]he issue of causation is ordinarily left to the factfinder," this rule "is not absolute." Id. at 59-60 (citing Fluehr v. City of Cape May, 159 N.J. 532, 543 (1999)). The "mere possibility" of causation is not enough, "and when the matter remains one of pure speculation or conjecture, or the probabilities are

---

[3] Because the motion judge correctly found plaintiffs did not establish prima facie evidence of a dangerous condition, we need not address plaintiffs' arguments regarding the notice, and palpably unreasonable prongs of the TCA because they presuppose a dangerous condition. In any event, if we did address these issues, we would affirm the motion judge's findings for the reasons expressed in his opinion.

A-2866-22

at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." Id. at 60-61 (quoting Davidson, 189 N.J. at 185).

The record here lacked evidence of causation. Neither plaintiffs nor any other witnesses identified a specific cause for the accident. Without expert testimony to establish causation by means of reconstruction or some other admissible method, the jury would be left to speculate whether the purported defect on the roadway could cause Alfred to lose control of his motorcycle.

V.

Plaintiffs contend the motion judge erred in granting summary judgment without first conducting oral argument. The parties requested oral argument when they filed the initial summary judgment motions. The second judge declined to adjudicate the motions and elected to conduct the N.J.R.E. 104 hearing. Following the hearing, the motion judge allowed the parties' supplemental briefing, adjourned the matter to enable them to participate in mediation, and ultimately entered the order barring the expert and granting defendants summary judgment.

On appeal, plaintiffs concede they did not seek oral argument following the evidentiary hearing. Nevertheless, they urge us to reverse, arguing they were entitled to oral argument.

With certain exceptions that do not apply here, Rule 1:6-2(d) grants, as of right, a party's request for oral argument.  However, "[t]he question of whether a motion should be decided on the papers or with oral argument does not apply when there are contested facts requiring an evidentiary hearing for disposition or the nature of the motion itself similarly warrants a hearing."  Pressler & Verniero, Current N.J. Court Rules, cmt. 5 on R. 1:6-2(d) (2024).  Moreover, the movant must show that the failure to conduct oral argument resulted in prejudice warranting reversal.  Finderne Heights Condo. Ass'n v. Rabinowitz, 390 N.J. Super. 154, 165-66 (App. Div. 2007).

Although the motion judge did not conduct oral argument on the summary judgment motions, the record shows he afforded counsel the opportunity to make opening statements at the N.J.R.E. 104 hearing and written submissions post-hearing.  Moreover, plaintiffs do not point us to where they were prejudiced by the lack of oral argument.  And given our discussion of the legal issues in the preceding sections, we are unconvinced oral argument would have changed the outcome such that depriving the parties of it constituted reversible error pursuant to Rule 2:10-2.  At best, the failure to conduct oral argument was harmless error.

## VI.

On the cross-appeal, Urban argues the judge erred when he denied its motion to dismiss plaintiffs' claims under the statute of limitations. Urban asserts plaintiffs' claims were not preserved when they pled their claims against fictitious parties.

Because we have affirmed on the appeal, which included granting Urban summary judgment and dismissal of the complaint against it with prejudice, we need not reach Urban's arguments on the cross-appeal. If we did, we would affirm for the reasons expressed by the first motion judge when he denied Urban summary judgment under the statute of limitations.

## VII.

Finally, to the extent we have not addressed an argument raised on the appeal or cross-appeal, it is because they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2866-22